# EXHIBIT 2

American K-9 Detection Services, Inc., et al,
Plaintiffs,


vs.


Rutherfoord International, Inc., et.al,
Defendants.



In the United States District Court
Middle District of Florida
Orlando Division



Case No.: 6:14-cv-1988-Orl-37TBS



**Expert Report**
Submitted by
William D. Hager
On Behalf of the Plaintiffs

1


DEFENDANT'S
EXHIBIT NO. 2
FOR IDENTIFICATION
Hager
DATE: 4/1/16   RPTR: DAC

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Introduction .................................................................................3 |
| II. | Specific Expertise …......................................................................4 |
| III. | Expert Opinions and Further Discussion.…………………………....7 |
| IV. | Additional Expertise to Render These Expert Opinions…....…….....8 |

## APPENDICES

Appendix A…………………………………………...…….Curriculum Vitae
Appendix B …………………………………………………………Publications
Appendix C …………………………………………….…Prior Testimony
Appendix D ……………………………...…………….Documents Reviewed

## I. Introduction.

**Introduction.** I have been retained as an expert witness by the law firm or Alvarez, Winthrop, Thompson & Storey, P.A., (sometimes the "Alvarez Law Firm") on behalf of the Plaintiffs in this matter, namely American K-9 Detection Services, Inc. and American K-9 Detection Services, LLC (sometimes collectively just "American K-9") in their lawsuit against Rutherfoord International, Inc., and Sara Payne (sometimes, collectively just "Rutherfoord").

**Ongoing Considerations.** I am submitting this report on the specific issues stated herein. I reserve the right to amend and otherwise modify this report, including its summaries, opinions, and all other elements. Specifically it is possible that additional information and documents will require subsequent consideration in connection with (i) the opinions expressed in this report and (ii) possible opposing expert opinions. As to the opinions set out below in this report, I have reached these opinions based upon a reasonable degree of professional certainty.

**Qualifications to Render These Expert Opinions.** My opinions are based on my skill, knowledge, training, education, expertise, and experience, which are detailed in the attached Curriculum Vitae (see Appendix A), as well as on my specific expertise set out below under Section II and IV of this Report and referenced websites.

**Sources of Information.** I obtained documents and used resources from: (i) Alvarez Law Firm as more fully detailed below; (ii) standard insurance reference materials; and (iii) certain regulatory materials including, among others, materials (including rules and regulations) from the National Association of Insurance Commissioners (sometimes "NAIC") as utilized by the various state departments of insurance (SDOIs). See the discussion below for more details.

**Documents Reviewed in Reaching All of These Expert Opinions and Conclusions.** In reaching each of the expert opinions and conclusions in this report, I utilized all of the documents and data referenced in this report.

**Foundation to All of the Opinions.** Thus, each of the expert opinions and conclusions in this report is based on a combination of (i) my skill, knowledge, training, education, expertise, experience and working knowledge of the specific areas and matters at issue herein, (ii) prevailing standards in the industry including custom and practice and (iii) documents cited.

**Reasonable Degree of Professional Certainty.** I have reached these opinions based on a reasonable degree of professional certainty.

**Prudent Insurance Agent.** These opinions are based on what a reasonably prudent insurance agent should and would do in comparable circumstances like those at issue in this case.

**Ongoing Discovery.** I am submitting this report on the specific matters set out below in connection with this litigation. I understand that this case is in ongoing discovery and as such, I reserve the right to amend and otherwise modify this report including its summaries, opinions and all other elements.

3

**Limitations of All of These Expert Opinions.** These entire expert opinions and conclusions relate to and are specifically limited to the unique facts of this case; as such, these opinions do not have applicability beyond the facts of this case.

**Compensation.** I am being compensated at the rate of $500 per hour for my work on this case. This is my usual and customary rate.

## II. SUMMARY OF MOST RELEVANT EXPERTISE.[1]

In connection with these opinions, I have drawn on my expertise (i) as summarized immediately below here in Section II of the report, (ii) as set forth in Section IV of this report and (iii) as set forth in my Curriculum Vitae, attached, including the referenced websites.

This case calls for expertise as to as to the following matters: (i) the obligations and responsibilities of an insurance agent in connection with the availability and sale of so-called DBA insurance (see the description immediately below and elsewhere in this report – given its orientation, I will refer throughout this report to the DBA insurance as "DBA insurance" or simply workers compensation insurance, which it is), (ii) DBA insurance like that at issue here and (iii) the regulatory oversight over the process.[2]

***DBA insurance*** is a component of the federal Longshore and Harbor Workers Compensation Act (LHWCA). That act provides for workers compensation coverage for certain maritime workers and others. In addition to maritime workers, Congress has extended LHWCA to cover, among others, U.S. government contractors (civilians) working in foreign countries.[3]  An employer is required by the LHWCA and underlying rules and regulations to obtain coverage for its employees prior to overseas deployment. Failure to obtain DBA insurance carries severe penalties. In addition, DBA insurance parallels that of workers compensation in both its benefit scheme and its provision, that once the coverage is in place, the employer is immune from liability to the injured employee - with the DBA insurance the exclusive remedy available to the injured employee. In brief, DBA insurance is workers compensation insurance covering civilians working in foreign countries under U.S. government contracts.

In view of the fact that DBA insurance is workers compensation insurance, my references in this report to workers compensation insurance or the like include reference to DBA insurance.

*Regulatory Expertise.* From a regulatory perspective, my expertise as to these matters can be found as follows: I am a former

- Commissioner of Insurance (Iowa),

---

[1] In summary fashion, I set out here my qualifications as to this matter. These qualifications in this section II should be read together with (i) my expanded statement of qualifications as to this case as set forth in Section IV of this report and (ii) my Curriculum Vitae as set forth at Appendix A, inclusive of all of its references, of this report.

[2] I do not express legal opinions in this report. My opinions are based on custom and practice in the industry that come to bear on this matter.

[3] The insurance requirements of the DBA are identical to those of the LHWCA.

4

- First Deputy Commissioner of Insurance,

- Member of the National Association of Insurance Commissioners (NAIC);

- Administrative Law Judge at the Department of Insurance (IA),[4] and

- Assistant Attorney General assigned on a full time basis to the Department of Insurance.

In those capacities, on a daily basis, I had full regulatory oversight and responsibility for and I dealt directly with commission matters in terms of (i) the obligations and responsibilities of an insurance agent in connection with the availability and sale of so-called DBA insurance (see the description immediately below and elsewhere in this report – given its orientation, I will refer throughout this report to the DBA insurance as "LHWC coverage"), (ii) DBA insurance like that at issue here and (iii) the regulatory oversight over the process.

*Expertise: Legislative.*[5] In addition to my regulatory background, I have served or am serving in the following legislative capacities, each of which included daily knowledge of and interaction with (i) the obligations and responsibilities of an insurance agent in connection with the availability and sale of so-called DBA insurance (see the description immediately below and elsewhere in this report – given its orientation, I will refer throughout this report to the DBA insurance as "LHWC coverage"), (ii) DBA insurance like that at issue here and (iii) the regulatory oversight over the process.

- Legal Counsel to the Iowa House of Representatives;

- Chief of Staff at the U.S. House of Representatives,

- Elected Member of the Florida House of Representatives (currently)[6] where I serve as a Member and Vice Chairman of the Insurance Committee (among other committees), which has legislative oversight over all insurance operations in the state (as administered by the Florida Office of Insurance Regulation) including those relating to insurer and insurance agents and their obligations and workers comp and LHWC policies as well;

- In addition, I have sat on and served as Vice Chairman of the Civil Justice Subcommittee of the Florida House, which has responsibilities as to Florida laws that establish (among other things) liability,

*Expertise: Industry.* In addition to my regulatory background and my legislative background as to commission matters, I have served or am serving in the following industry capacities, each of

---

[4] Then known as a "Hearing Officer".

[5] My background at both the U.S. Congress and with the Florida House of Representatives could be construed as regulatory in nature but I include it here under my non-regulatory experience because it seems to be a better fit. In addition to these legislative positions, I have also served as Deputy Mayor and Member of the City Council of the City of Boca Raton, Florida, where I headed up the Council's insurance oversight function. I have also served as an Elected Member of the West Des Moines Iowa Board of Education.

[6] I am currently serving my 6th year in the Florida House of Representatives.

which included daily knowledge of and interaction with (i) the obligations and responsibilities of an insurance agent in connection with the availability and sale of so-called DBA insurance (see the description immediately below and elsewhere in this report – given its orientation, I will refer throughout this report to the DBA insurance as "LHWC coverage"), (ii) DBA insurance like that at issue here and (iii) the regulatory oversight over the process.

- American Academy of Actuaries, Washington, D.C., where I served as General Counsel and Chief Lobbyist;

- President and Chief Executive Officer of the National Council on Compensation Insurance (NCCI), a major U.S. property casualty insurance company (workers compensation inclusive of LHWC act coverage) doing business throughout the United States, including Iowa and employs about 1,000 personnel. While CEO, this position entailed responsibility for pricing some $100 billion of property casualty insurance (workers compensation) premium and involved daily interaction with agents and their issues;

- Nationally certified Reinsurance Arbitrator (ARIAS-US), where I sit as an arbitrator on disputes between (among others) insurers selling products like those at issue here and their reinsurers,

- Attorney practicing primarily in the area of insurance and reinsurance and admitted to practice in Florida, Illinois[7] and Iowa (all upon examination) with an insurance practice;

*Expertise: Reinsurance Arbitrator.* In addition to my regulatory background and my legislative background as to commission matters, I have served or am serving in the following industry capacities, each of which included daily knowledge of and interaction with (i) the obligations and responsibilities of an insurance agent in connection with the availability and sale of so-called DBA insurance (see the description immediately below and elsewhere in this report – given its orientation, I will refer throughout this report to the DBA insurance as "LHWC coverage"), (ii) DBA insurance like that at issue here and (iii) the regulatory oversight over the process.

- Nationally certified Reinsurance Arbitrator (ARIAS-US), where I sit as an arbitrator on disputes between (among others) insurers selling products like those at issue here and their reinsurers,

*Expertise: Attorney.* In addition to my regulatory, industry and legislative background, I have served or am serving in the following legal capacities, each of which included daily knowledge of and interaction with *Expertise: Industry.* In addition to my regulatory background and my legislative background as to commission matters, I have served or am serving in the following industry capacities, each of which included daily knowledge of and interaction with (i) the obligations and responsibilities of an insurance agent in connection with the availability and sale of so-called DBA insurance (see the description immediately below and elsewhere in this report – given its orientation, I will refer throughout this report to the DBA insurance as "LHWC

---

[7] This Illinois license is in inactive status, placed there by me at my volition and eligible for reactivation at any point in time upon my request.

coverage"), (ii) DBA insurance like that at issue here and (iii) the regulatory oversight over the process.

- As stated above, I am an attorney admitted to practice in Florida, Illinois and Iowa (all upon examination) with an insurance practice;

- Legal Counsel to the Iowa House of Representatives;

- Practicing attorney at Hager & Schachterle;

- Iowa Counsel to the Property Casualty Insurance Association of America (PCI), many of whose members sell workers compensation/ LHWC policies like those at issue here.

- Legal Counsel to the Professional Insurance Agents of Iowa (property casualty agents; whose agents sell among other things, policies like those at issue here);

- Legal Counsel to the Iowa Association of Life Underwriters (life, health and annuity insurance agents).

- Practicing attorney (currently) in Florida at the Hager Law Firm;

- General Counsel and Chief Lobbyist to the American Academy of Actuaries;

*Additional Expertise, Formal Education.* In addition, my formal education was beneficial in forming the expert opinions in this matter. That education and related matters is as follows:

- Bachelor's degree in mathematics (secondary mathematics education) from the University of Northern Iowa;

- Master's degree in educational psychology;

- Juris Doctorate degree, University of Illinois;

- Various bar admissions, all by examination;

- Certified Reinsurance Arbitrator;

### ADDITIONAL EXPERTISE CONSIDERATIONS

- *Insurance Agent/ Broker Issues.* The expertise called for here is primarily that relating to commissions paid to agents. In addition to the above, my agent expertise is set out at http://expertinsurancewitness.com/insurance-agent-liability-expert/

- Workers   Compensation/   LHWC   Act   coverage/DBA   Coverage   at http://comppremiumwizards.com

- *Standards of Practice/ Custom and Practice within the industry:* *http://expertinsurancewitness.com/insurance-industry-standard-practices-expert/*

- As to other matters, my expertise is set out at http://expertinsurancewitness.com/

## III. ASSIGNMENT AND EXPERT OPINIONS AND SUPPORT THERETO

**Assignment.** My assignment was to read and review various records and documents in this case and then enter expert opinions, based on custom and practice in the industry, as to whether the insurance agency involved ("Rutherfoord"[8]) met its obligations and responsibilities as to the DBA insurance matters at issue.

**Consideration of Certain Facts.** In entering these expert opinions, I considered the following matters or facts – in a non-exhaustive manner - as they are reflected in the documents of the case or can reasonably be gleaned from such documents:

1. During the time in question, American K-9 was engaged in the business of training and placing working dog teams pursuant to various domestic and international contracts;

2. The dog teams carried out the activities of patrol, narcotic, cadaver and explosive;

3. Rutherfoord is an insurance agency specializing in DBA insurance;

4. Rutherfoord was American K-9's insurance agency for purposes of DBA insurance and had been for some time prior to the incidences of this matter;

5. American K-9 was required from time to time to obtain DBA insurance in connection with its contracts;

6. DBA insurance is as described earlier in this report;

7. In November of 2009, American K-9 advised Rutherfoord that it required DBA insurance in connection with a certain contract it had entered into with the Canadian government to provide working dog teams in Afghanistan as to explosive detection;

8. At that time, Rutherfoord wrongly advised American K-9 that DBA insurance could be provided only as to U.S. government funded contracts and as such, DBA insurance was unavailable to American K-9 for the contract at issue;

9. Although this information provided by Rutherfoord was incorrect, American K-9 did not know that it had received incorrect information from Rutherfoord;

---

[8] When I use "Rutherfoord" in this report to refer to the selling insurance agency, I am referring as well to its employees and operatives including individuals like Sara Payne and others.

10. Rutherfoord stated to American K-9 that the only option then available to American K-9 to cover the subject exposure was to obtain personal accident policy through Lloyds of London.

11. American K-9 did purchase such accident policies through Lloyds for affected workers;

12. These Lloyds policies did not provide the same level of benefits as did DBA policies; in fact these Lloyd policies provided substantially fewer benefits;

13. Further, these policies did not provide the same immunities to American K-9 as did the DBA policies;

14. On July 26, 2010, Rutherfoord's attorney Keith Flicker advised Rutherfoord that its insurance advice as given to American K-9 was inaccurate and incorrect.

15. This was so because the forward operating bases from which American K-9 was operating were in fact under the control of the U.S. government;

16. Upon receiving this advice Rutherfoord failed to contact American K-9 and so advise them;

17. On August 4, 2010, American K-9 learned through its subcontractor on Canadian contacts (namely Ronco Consulting) that DBA insurance was available for the Canadian contracts because Ronco had obtained DBA insurance through Rutherfoord for the same kind of contracts.

18. American K-9 and Ronco were providing parallel services in the same geographic area under similar contracts;

19. Based on this information, on August 5, 2010, American K-9 contacted Rutherfoord again requesting DBA insurance;

20. Despite the urgency of such matters, Rutherfoord did not bind coverage for DBA until August 12, 2010;

21. Prior to all of this and prior to the binding of coverage but after the initiation of the dog handler contracts, American K-9 dog handlers were injured while working under the contracts at issue;

## ASSIGNMENT AND EXPERT OPINIONS.

**Assignment.** My assignment was to read and review certain documents and records in this case and then enter expert opinions, if any, as to whether Rutherfoord met its obligations and responsibilities to its insured American K-9 in the insurance matters at issue in this case.

## EXPERT OPINIONS.

**Expert Opinion: Rutherfoord Breached its Obligations.** Based in custom and practice in the insurance industry, an insurance agent[9] such as Rutherfoord under circumstances such as here, has an obligation and responsibility to (i) use reasonable care in procuring the requested insurance coverage and (ii) to explain the coverage the agent has put in place.

**Expert Opinion.** Rutherfoord breached these obligations and responsibilities in this matter and fell below the standard of care in that Rutherfoord advised the Plaintiffs that the DBA insurance coverage they wanted and were required to obtain, was coverage for which they were not eligible (not at Rutherfoord and not at any other agency and not from any insurer) because Rutherfoord stated that the underlying contract was required to be US Government funded as a condition precedent to such coverage and the Plaintiffs' contract was not.

In all of this, Rutherfoord's advice was erroneous and inaccurate and Rutherfoord knew or should have so known. In all of this, Rutherfoord breached its obligations and responsibilities toward the Plaintiffs in the insurance matters at issue.

**Expert Opinion.** When Rutherfoord learned of its error in advising and directing the Plaintiffs as to the insurance matter at issue, they breached their obligations in not immediately so advising the Plaintiffs. Had Rutherfoord (i) accurately advised the Plaintiffs in the first instance, coverage would have been in place for the underlying injuries at issue and (ii) advised the Plaintiffs when Rutherfoord learned of its error, subsequent underlying injuries would have been covered under the DBA insurance.

**Expert Opinion: Rutherfoord Breached its Obligations: Rutherfoord's Longstanding Relationship with Plaintiffs.** In addition to its obligations stated above (i.e., reasonable care and explanation), Rutherfoord had additional obligations in this matter as to American K-9. This is so because of the special relationship between Rutherfoord and American K-9. Based in custom and practice, this special relationship created additional obligations and responsibilities in Rutherfoord – above and beyond those cited above - as to the insurance of American K-9.

Those obligations included, as here, accurately advising the insured as to the requested coverage and then procuring that coverage. Rutherfoord breached this obligation and responsibility in that it (i) failed to properly advise American K-9 as to the availability of DBA insurance and (ii) failed to procure that coverage so as to meet American K-9's insurance needs.

In custom and practice in the industry and based on the record of this case, I took into account the following considerations in reaching my opinion that Rutherfoord had an obligation to American K-9 over and above that ordinarily expected of an insurance agent. Specifically it is my opinion that Rutherfoord had a greater obligations and responsibilities to American K-9 based on the following:

---

[9] Throughout this report I use the term "insurance agent" or its equivalent to reference those agents, by whatever formal or legal characterization, as those individuals or entities who place insurance coverage for insureds at the retail level, such as Rutherfoord did as to American K-9, whether doing business in Florida or Virginia.

- The fact that Rutherfoord touted its expertise as to these matters;

- Rutherfoord and American K-9 had a long working relationship as to the kind and amounts of insurance matters at issue;

- Rutherfoord had in-depth knowledge of the insurance needs and responsibilities of American K-9

- That Rutherfoord had in the past participated with American K-9 as to this coverage;

- That is to say, Rutherfoord provided in writing to American K-9 information as to American K-9's insurance coverage needs;

In all of this, based on these and other considerations, Rutherfoord had a special relationship with American K-9 requiring Rutherfoord to provide that higher level of skill and services to American K-9 – specifically to accurately and competently advise American K-9 as to its insurance needs, here meaning advising that the coverage requested by American K-9 was in fact available in the market and the contract at issue was eligible for DBA coverage. A review of the documents and records in this case show that Rutherfoord breached these additional obligation in particular as to the shortfall of replacement coverage as to the matter at issue.

***Conclusion as to Rutherfoord.*** In all of this, Rutherfoord breached their obligations and responsibilities as to the matter at issue;

### Support for these Expert Opinions.

***Support and Documents Reviewed.*** In addition to the support for the above expert opinions that is embedded in the statement of the opinions themselves and the facts set out earlier, set out below is further support for these opinions, though what follows are examples of support, not an exhaustive list of support. In addition, each opinion is itself, as applicable, support for every other opinion.

1. Custom and practice in the industry;

2. My expertise as to these matters;

3. The insurance policies at issue;

4. The pleadings;

5. Various documents reviewed, including, among others, all of those referenced in this report;

6. Virginia and Florida rules and regulations;

11

7. The Virginia and Florida Insurance Code.

8. National Association of Insurance Commissioners (NAIC) materials as utilized by the Florida Office of Insurance Regulation and the Virginia Bureau of Insurance;  and

9. Others.

## IV. ADDITIONAL EXPERTISE.

My opinions are based on my skill, knowledge, training, education and experience, which are set out in detail in the attached Curriculum Vitae (See Appendix A) and in Section II above.   In addition to my specific background relating to commission, set out below is related but more general expertise.

**A. Formal Education.**

- **1. Bachelor's Degree in Mathematics.** I hold a bachelor's degree in secondary mathematics education from the University of Northern Iowa;

- **2. Master's Degree in Psychology.**   I hold a master's degree in educational psychology from the University of Hawaii; and

- **3. Juris Doctor's Degree.** I hold a J.D. degree from the University of Illinois.

**B. Licensure and Certification.**

- **4. Certified Reinsurance Arbitrator.** I am certified by ARIAS as one of about 400 U.S. certified reinsurance arbitrators;

- **5. Admitted to Practice Law.** I am licensed and admitted to practice law upon examination in the states of Iowa, Illinois and Florida; and

- **6. Admitted to Practice before the U.S. Supreme Court.** I am also admitted to practice before the U.S. Supreme Court.

**C. Insurance Expert.**

- **7. Expert Witness:** I have served as an expert witness in several cases throughout the U.S. and have been qualified at trial as an expert witness in about 20 states.

- **8. Insurance Consultant to the U.S. Attorney:** By way of example of my various assignments, I have been retained in the past by the U.S. Attorney, the Middle District of Florida, as an insurance consultant in a complex civil insurance matter.

- **9.   Insurance Consultant to the U.S. Department of Justice.** Similarly, I have also been retained by the U.S. Department of Justice as an insurance consultant in a complex insurance case.

- **10. Expert Witness: the United States Air Force.** I have also been retained as an expert witness by the United States Air Force in a complex CGL matter.

- **11.    Expert Witness: on Behalf of Various Departments of Insurance.** I have also been retained as an expert witness by the: (i) Florida Department of Insurance[10] and recently testified on their behalf in Florida state court, and (ii) the Oklahoma Department of Insurance and testified on their behalf.  In addition, I have testified as an expert before the Florida, Nevada, Oklahoma, South Dakota, Wisconsin and Texas Departments of Insurance

## D.  Industry Background:  Reinsurance Arbitrator.

- **12. Reinsurance Arbitrator: November 2003 to Present.** My background includes extensive exposure to the various reinsurance mechanisms and relationships.  Along these same lines and as indicated above, I am a certified ARIAS-US reinsurance arbitrator (see immediately below) and have sat as an arbitrator in cases between insurers and their reinsurers relating to workers compensation matters.  The relevance of this experience to this case is that reinsurers have substantial influence on their underlying insurers.

  As of November 2003, I was certified by AIDA Reinsurance and Insurance Arbitration Society, United States ("ARIAS-US") as an arbitrator for reinsurance and insurance matters.  Today, there are about 200+ individuals so certified by ARIAS in the United States.

  ARIAS-US certifies knowledgeable and reputable professionals for service as panel members in reinsurance and insurance arbitration matters.  The organization's criteria for certification are as follows:

  - 10 years of significant specialization in the insurance/reinsurance industry;

  - Arbitration experience – must have completed appropriate credited ARIAS seminars;

  - A member in good standing of ARIAS-US; and

  - Appropriate endorsement from existing members.

## E.   Industry Background in General

---

[10]   Renamed the Florida Department of Financial Services.

- **13. CEO of a Major US Insurance Organization, Regulated Throughout the US; President and Chief Executive Office of the National Council on   Compensation Insurance (NCCI; Boca Raton, Florida), 1990 – 1998.** NCCI is one of the larger and more pervasive U.S. insurance organizations. During my tenure as President and CEO, NCCI had (and continues to have) responsibility to accurately price and file pricing for some $12 - $15 billion of workers compensation insurance in 39 states throughout the U.S. NCCI prepared proposed premium filings for regulators to approve by extracting key data from its 600 member insurance companies and then used that data to project necessary premium changes. NCCI accomplished this mission through some 1,000 employees of which approximately 600 were professionals, and had an annual revenues of $140 million.

  **Insurance Program.** As CEO, I had daily exposure and responsibilities to the U.S. workers compensation program as administered by the various states, which constitutes one of the largest property casualty insurance programs in the world with some 100 million worker lives insured (in addition, of course, other important coverages are provided through workers compensation, most notably life insurance, wage replacement and medical coverage).

  **Agent Matters.** Most all workers compensation is sold through insurance agents and as such, I had daily contact with the agent community and significant interaction with agent matters.

  **Industry Standards of Practice.** While President and CEO of NCCI, I visited and physically toured and reviewed in excess of 400 insurance companies and gained direct exposure to the procedures and processes and standard industry practices of the U.S. insurance community and its commission, underwriting and claim settlement practices. I have had extensive exposure to insurer practices and procedures.

  **Florida and Virginia: Licensed to do Business in Florida and Virginia: Familiar with Florida and Virginia's Regulatory Scheme.** While CEO of NCCI, it was (and remains) licensed to do business in Florida and Virginia as a contractor to that state's workers compensation rate making and underwriting organization. In that capacity, my company, NCCI, was subject to licensure by the FL OIR and the VBI and was subject as well to the regulatory scrutiny of the these agencies as well as being subject to all applicable provisions of the Florida and Virginia Insurance Code. NCCI was also subject to state and federal jurisdiction as to Florida and Virginia. As such, I am familiar with the regulatory and statutory scheme that is brought to bear on insurance in the state.

- **14. General Counsel and Director of Government Relations to the American Academy of Actuaries (Washington D.C.), 1980 – 1983.** I served as General Counsel and Director of Government Relations for the American Academy of Actuaries, including advising on admissions, discipline, federal antitrust and general corporate law. I represented the 10,000-member professional organization before Congress (e.g., Senate Committees on Banking, Commerce, Finance and Labor, and

House committees on Education, Labor, Energy, and Ways and Means) and the various federal regulatory agencies.

**Insurance Companies.** The Academy is the professional organization of actuaries and includes qualified actuaries from all disciplines and all forms of insurers. Academy members included affiliation with virtually every insurance company in America. The Academy's Board of Directors was likewise made up of leading insurance company executives from such companies.

- **15. Risk Metrics Corporation.** I co-founded this Florida based information company in 1998. Risk Metrics (including Datalister, Inc.) gathers and sells public data relating to workers compensation to a wide range of insurance oriented customers, including insurance agents. Within the last few years, I have sold my interest in this corporation.

- **16. Attorney in Private Practice.** As an attorney in private practice, I represented a number of agent and insurer interests and became familiar with applicable regulatory and industry standards of practice. Those interests included the position of Iowa Counsel to the Iowa Association of Life Underwriters, whose members sold many of the products at issues here.

    **Iowa Agent Issues.** Those interests also included intimate involvement with commission, as counsel to the:

    Professional Insurance Agents (PIA) of Iowa (property casualty insurance agents who sell the kind of coverage at issue here) and

    Iowa Association of Life Underwriters (Medicare supplement, long term care, senior life, life, health and annuity insurance agents, many of whom sold ancillary health insurance products).

    Specific duties as counsel at both the PIA and the Iowa Association of Life Underwriters (life, health and annuity insurance agents) included in-depth familiarity with insurers and agents matters.

## F. Regulatory

- **17. Commissioner of Insurance, Iowa 1986 – 1990.** As Insurance Commissioner appointed by Governor Terry Branstad in July 1986, I was responsible for the regulatory oversight of all insurance companies, agents and brokers authorized to conduct business in the state of Iowa. My agency was responsible for solvency oversight, insurance company examinations, financial and accounting matters of insurance companies, consumer protection, agent and broker licensing, and oversight of insurance company practices, including claim settlement practices and matters such as those at issue in this Copple case. In particular, that oversight included the responsibility of overseeing practices of insurers and agents. In addition, I oversaw

the state regulation of the securities industry with Iowa's Superintendent of Securities reporting directly to me.

**Regulatory Oversight: Insurer Practices.** In addition, as Insurance Commissioner, my responsibilities included oversight over the education, licensing, discipline and general supervision of all insurance companies and agents in the state.[11] I am very familiar with the responsibilities and applicable obligations that come to bear upon insurance companies and their agents.

**Financial Examination of Insurance Companies.** As Insurance Commissioner, I directed and oversaw the examination of all insurance companies authorized to do business in the State of Iowa. Those examinations included focus on both financial matters (so called triennial examinations of insurers – of which well over 100 such examinations were conducted while I was Commissioner) and examinations of specific complaints about insurers (so called Market Conduct Examinations - well over 50 such exams were conducted while I was Commissioner).

**Market Conduct Examinations of Insurer and Agent Practices.** Market Conduct Examinations focused on marketplace issues such as those at issue in this case, specifically examining insurance companies as to compliance with their agent practices. Concurrent with such exams, I personally reviewed and approved the final Examination Reports before they were issued. In addition, in many of these instances, I visited the subject insurer before the Examination Report was issue, including walking the floors of such insurance companies – reviewing their effected operations first hand.

**Prosecution of Insurance Companies and Insurance Agents.** As Insurance Commissioner, I employed a full time team of lawyers who fielded consumer complaints relating to all areas of insurance company operations, including agent activities. Indeed, many of these complaints, as well as results of Market Conduct Examinations, resulted in formal action under the state's Administrative Procedures Act. From time to time, I served as the Hearing Officer as to such matters.

**Major Insurance State.** Iowa has about 1,000 authorized property and casualty insurance companies and over 500 life/ health insurance companies, many of (but not all of whom) write the policy forms at issue here and an unusually large number of domestic insurance companies and as such, insurance regulation in that state is a serious job.

**Familiarity with Florida and Virginia's Insurance Regulation.** As Insurance Commissioner in Florida and Virginia with interaction with Florida and Virginia regulators, as a member of the NAIC with frequent interaction with the Florida and Virginia regulators and as CEO of NCCI, where we were licensed to conduct business in Florida and Virginia by the FL OIR and the VBI and I am familiar with the regulatory scheme in place in Florida and Virginia.

---

[11] Who held an insurance agent's license with authority to sell insurance.

- **18. National Association of Insurance Commissioners (NAIC), 1986 – 1990.** Concurrent with my service as Iowa Insurance Commissioner, I served as a member of the NAIC. The NAIC is an organization of the Insurance Commissioners of all 50 states and meets quarterly in locations throughout the U.S. to consider and evaluate national insurance issues. Further, the organization is professionally staffed with more than one hundred personnel. The organization is based in Kansas City, Missouri. The NAIC considers all major insurance issues and then promulgates model insurance laws and regulations, which are then routinely (but optionally) adopted at the individual state level.

**NAIC Chairmanships – Chairman of the Midwest Zone.** I was elected by my fellow Insurance Commissioners from the Midwest Zone (composed of the Midwest states, constituting about one quarter of all of the states) to provide leadership and representation of the Midwest before the balance of the states. This position included a position on the Executive Committee of the NAIC as well as major responsibilities relating to the assignment of states (and their related examiners) to specific examinations, both triennial and Market Conduct.

**NAIC Leadership: Member of the Executive Committee.** I also served as an elected member of the Executive Committee of the NAIC, the body that served as the steering committee of the organization, providing leadership between full membership meetings and providing recommendations to the full membership as to complex or politically charged issues within the organization including that of agent and commission issues.

**Other NAIC Chairmanships:** I also served in a number of NAIC capacities including Chairman of the Financial Services and Insurance Regulation Task Force.

In addition, my service on the following NAIC Committees was also helpful in this regard:

- Member, the Blanks Committee
- Member, Guarantee Fund Committee
- Member, Rehabilitator and Liquidators Committee
- Member, Casualty Actuarial Committee
- Member, Commercial Lines Committee
- Member, Valuation of Securities Committee,
- Member, International Insurance Relations Committee
- Member, Accounting Practices and Procedures Committee and
- Member, State and Federal Legislative Committee.

**Ongoing Regulatory Involvement.** In the years since leaving the regulatory ranks, I have continued to be closely involved with the NAIC and the regulatory community. As President and CEO of NCCI, I was in regular attendance at meetings of the NAIC and continue to attend these meetings and to be actively engaged with the regulatory process. Included in this attendance were my observations at the NAIC of the regulation of commission.

- **19. First Deputy Commissioner of Insurance, Iowa 1976 – 1978.** As First Deputy Insurance Commissioner, I was responsible for the regulatory oversight of all insurance companies, agents and brokers authorized to conduct business in the state of Iowa. I was responsible for solvency oversight, insurance company examinations, financial and accounting matters of insurance companies, consumer protection, agent and broker licensing, and oversight of insurance company practices, including claim settlement practices. In particular, that oversight included the responsibility of overseeing practices of insurer commission practices

   **Regulatory Oversight: Insurer and Agent Practices.** In addition, as First Deputy Insurance Commissioner, my responsibilities included oversight over the education, licensing, discipline and general supervision of all insurance companies and agents in the state. I am very familiar with the responsibilities and applicable obligations that come to bear upon insurance companies in connection with their agents.

   **Market Conduct Examinations of Insurer and Agent Practices.** Market Conduct Examinations focused on marketplace issues such as those at issue in this case, specifically examining insurance companies as to compliance with their agent obligations. Concurrent with such exams, along with the Commissioner, I personally reviewed the final Examination Reports before they were issued. In addition, in many of these instances, I visited the subject insurer before the Examination Report was issue, reviewing their effected operations first hand.

   **Prosecution of Insurance Companies.** As First Deputy Insurance Commissioner, I oversaw a full time team of lawyers who fielded consumer complaints relating to all areas of insurance company operations. "Consumer complaints" included agent complaints against their insurer or of their competitors. Indeed, many of these complaints, as well as results of Market Conduct Examinations, resulted in formal action under the state's Administrative Procedures Act. From time to time, I served as the Hearing Officer as to such matters.

- **20. Iowa Assistant Attorney General Assigned to the Insurance Department,** 1975-1976; serving as the Department's General Counsel. As Assistant Attorney General, I had departmental prosecutorial responsibilities for violations of the Insurance Code under the state's APA act including those relating to insurers and agents. The Attorney General responsibility also included issuing Attorney General Opinions as to the construction of insurance laws and regulations.

- **21.  Legal Counsel to House of Representatives.**  As legal counsel to the Iowa House of Representative (1975 session), I provided counsel on all relevant caucus issues and provided the following support:

    - Researched pending legislation,
    - Prepared memorandums in support of proposed legislation,
    - Provided legal advice, and
    - Participated in bill drafting, including that relating to agents and insurers.

- **22.  Lecturer at the Bar Review School, authoring and delivering the Insurance Course** to students studying for the Iowa Bar Exam (from about 1985- 1991).  I was invited to provide the insurance content review material and lecture for the insurance section of the bar review course in Iowa.  Included in this lecture was extensive law applicable to the interpretation and construction of laws and regulations applicable to insurers and agents.  I authored this material and provided this lecture to students studying to pass the bar for about six years, until accepting the position of President and CEO of NCCI.

- **23.  Chief of Staff:  U.S. Congress.**  I served as Chief of Staff at the U.S. Congress in Washington D.C. to an Iowa Congressman for about a year.  Among others, I participated in legislative drafting of insurance and reinsurance legislation.

- **24.  Expertise:  Elected Member of the Florida House of Representatives:  Vice Chairman and Member of the Insurance and Banking Committee; Vice Chair of the Civil Justice Subcommittee.**  In addition, I have gained background as to insurance policy matters during my service as an elected member of the Florida House of Representatives (elected in 2010 and re-elected in 2012).  In particular, I currently serve as Vice Chairman and as a member of the House Insurance and Banking Committee, whose jurisdiction includes legislative oversight over all of the insurance transactions in the state, including issues relating to among others, insurance agents and insurers.

Signed electronically and dated this 1st day of November, 2015

*William D. Hager*

William D. Hager

APPENDIX "A"

**WILLIAM D. HAGER**
**CURRICULUM VITAE**
(To be read together with http:/www.expertinsurancewitness.com)

## PRESIDENT, INSURANCE METRICS CORPORATION
BOCA RATON, FLORIDA - JANUARY 2000 to PRESENT

Mr. Hager formed Insurance Metrics Corporation in early 2000. The focus of this Corporation is three-fold:

1. The provision of reinsurance arbitration service,
2. The provision of expert insurance witness services, and
3. The provision of non-litigation insurance consulting.

## CERTIFIED REINSURANCE ARBITRATOR

Certified by ARIAS (AIDA Reinsurance and Insurance Arbitration Society) as one of some 400+ certified reinsurance arbitrators in the U.S. ARIAS certifies qualified arbitrators and serves as a resource for parties involved in related disputes. ARIAS provides procedural guidelines, best practices and a code of ethics for its members. Certified arbitrators must be knowledgeable and reputable and meet minimum criteria as follows:

1. Industry Experience. At least 10 years of significant specialization in the insurance/reinsurance industry;
2. Arbitration Experience. Completed at least three ARIAS conferences or workshops; and
3. Member of ARIAS. Be an individual member in good standing of ARIAS.

## ELECTED MEMBER OF THE FLORIDA HOUSE OF REPRESENTATIVES
NOVEMBER 2010 to PRESENT

Mr. Hager was first elected in November 2010 to a two year term to the Florida House of Representatives in Tallahassee Florida and re-elected to that same position in 2012 and 2014. Hager represents House District No. 89, which consists of the South and Central beach communities of Palm Beach County. Cities represented in Palm Beach County include Boca Raton, Boynton Beach; Briny Breezes; Delray Beach; Town of Gulfstream; Highland Beach; Hypoluxo; Lantana; Manalapan; Ocean Ridge; the Town of Palm Beach; the Town of West Palm Beach and Singer Island. The District encompasses about 170,000 Floridians. Hager serves on the following committees or subcommittees by appointment: Insurance and Banking; Judiciary; (parent committee); Civil Justice Subcommittee; Taxation and Charter Schools.

## PRINCIPAL, COMP WIZARDS LLC
NOVEMBER 2008 to PRESENT

Workers' compensation consultation services are offered for high risk industries such as construction, mining, and hazardous waste, as well as professional employer organizations (PEOs). Audits, the workers' comp classification system, e-mod analysis, high deductibles, retros, and scheduled ratings are analyzed by Mr. Hager and skilled actuaries who are highly experienced in workers' compensation.

## DEPUTY MAYOR (2004-2005) AND CITY COUNCIL MEMBER
CITY OF BOCA RATON, FLORIDA - APRIL 2002 to 2009

Mr. Hager was elected to a two-year term on the Boca Raton City Council, effective April 1, 2002. During his successful first term Council Member Hager focused on the city budget, quality of citizen services, increased educational opportunities and development plans. He was reelected to a second two-year term without opposition, effective April 1, 2004. At the same time Councilman Hager was also appointed Deputy Mayor, and he held this position for one year until 2005. Mr. Hager was subsequently re-elected to a third term of office in March of 2006, also without opposition, with that term running through March of 2009. As City Councilman and Deputy Mayor, Mr. Hager participated in the oversight of the Boca Raton City Government. He served as an elected member of the Boca Raton City Council through early 2009.

## CENETEC, L.L.C.
BOCA RATON, FLORIDA - JANUARY 2000 to JANUARY 2002

In early 2000, Mr. Hager co-founded Cenetec along with a group of entrepreneurs serving as its CEO and Chairman of the Board. Cenetec served us a for profit accelerator designed to help pioneering entrepreneurs turn their most innovative Internet and high technology products and services into successful companies. Cenetec enabled a number of early stage companies to effectively transform themselves into revenue producing enterprises. Cenetec currently holds positions in a number of such companies.

## CO-FOUNDER, RISK METRICS CORPORATION
BOCA RATON, FLORIDA - 1998 to 1999

Co-founded this information company in 1998. Risk Metrics gathers and sells public data to a wide range of customers. Mr. Hager recently sold his shares in Risk Metrics and no longer holds a position in the Company.

**PRESIDENT AND CHIEF EXECUTIVE OFFICER, NCCI, INC.**
BOCA RATON, FLORIDA - 1990 to 1998

Mr. Hager was appointed President and CEO of the National Council on Compensation Insurance (NCCI) in May 1990. NCCI is the nation's largest workers' compensation and health care informatics corporation. Headquartered in Boca Raton, Florida, the corporation provides rate making services, database products, software, publications and consultation services to state funds, self-insureds, independent bureaus, agents, regulatory authorities, legislatures and more than 700 insurance companies. While under Mr. Hager's leadership, NCCI had annual revenues approaching $150 million, NCCI employed 1,000 people located in 20 offices around the United States and was and is the licensed statistical and rate advisory organization in nearly 40 states. During Hager's leadership, NCCI had annual pricing responsibility for some $16 billion of workers' compensation premium and responsibility to gain regulatory approval of that pricing.

During Hager's tenure, NCCI doubled revenues (from $70 million to $150 million), reduced loss cost inadequacy to nearly zero (down from 25% inadequacy), brought residual markets to an underwriting break-even point (down from $2 billion in annual underwriting losses) and provided the intellectual foundation for $1.5 billion in statutory reform. Concurrently, the organization was right-sized (head count reduced from 1,500 to 1,000), firepower was substantially increased (technical and professionals increased from 40% to 85% of the employment base), and the organization was converted from a rate bureau to a contemporary, competitive information company.

Specific expert skills that emanate from this position include:

Reported to a Board of Directors consisting of the lead insurance industry CEOs;

Oversaw an actuarial department with 150 employees;

Directed rate filings totaling about $100 billion of premium consisting of about 500 complex rate filings; as such, I am very familiar with the rate making process, the strategy relating to filings and the organizational intent of all rate making   organizations;

Intensive management of the federal antitrust exposure of NCCI. As an organization that lawfully promulgated rates on behalf of competitors, this exposure was intensive and pervasive;

Positioned to provide powerful and pivotal strategic guidance and testimony to maximize either the resistance to a proposed rate filing or its approval. Working   with a former NCCI FCAS, we are able to zero in on the relevant features of these rate filings;

Positioned to provide pivotal expert testimony as to whether an insurer's behavior conforms or fails to conform to industry practices; Damages, including punitive damages as appropriate, regarding workers' compensation insurers; and RICO matters.

## INSURANCE COMMISSIONER, STATE OF IOWA
DES MOINES, IOWA - 1986 to 1990

As Insurance Commissioner appointed by Governor Terry Branstad in July 1986, Mr. Hager was responsible for the regulatory oversight of all insurance companies, agents and brokers authorized to conduct business in the state of Iowa. He directed departments responsible for solvency oversight, consumer protection, agency licensing, and the administration of property and casualty, life and health insurance industries. In addition, Mr. Hager oversaw state regulation of the securities industry with Iowa's Supervisor of Securities reporting directly to him.

Mr. Hager brought contemporary technology to the Insurance Division. He pushed for aggressive legislation resulting in increased prosecution of agents and companies. For example, in 1986, $16 million was recovered from insurers for Iowa consumers. Under his direction, the division spearheaded an effort to attract new insurance operations to Iowa. Under this program, 3,000 new insurance jobs were added in 1988 alone. The program continues to date and is nationally recognized as a model of a constructive environment for attracting insurer operations. He was also responsible for implementing an assertive senior citizens advocacy program to educate the elderly on insurance purchases. Mr. Hager also strengthened rate oversight by leading the effort to hire an FCAS within the Department. Under Hager's leadership the FCAS was paid substantially more than Hager and even more than the Governor of the State.

The most important and yet least visible regulatory tool for an insurance commissioner is regulating for solvency. Mr. Hager was recognized for tenacious solvency regulation. During his term, several preexisting insolvencies were brought to completion and closed out. Furthermore, a number of marginal domestic insurers were declared insolvent and liquidated. Mr. Hager also facilitated a preemptive sale of a $4 billion Iowa domestic insurance company (Integrated Resources Life Insurance Co.) when its parent teetered on insolvency. The department worked with the insurer when a "run on the bank" was imminent and led a rapid sale of the insurer preempting a probable major insolvency. Under the terms of the sale all policyholders were made whole.

The department also recommended and supported state and federal prosecution of several insurance executives (e.g., American Excel) who committed financial fraud.

Specific expert skills that emanate from this position include:

- Responsible for oversight, interpretation and application of entire Iowa insurance code, which is analogous to most states;

- Interpretation and application of insurance laws and regulations to specific fact settings on a daily basis;

- Functioned frequently as an APA Hearing Officer, applying insurance law to specific contested facts and rendering scores of written opinions. Topics included rate proposals for workers' comp, property/casualty, life and health; agents and insurer license revocations; unfair trade practice matters; and declaration of insolvencies;

- Working familiarity with SAP (vs. GAAP);

- Merger/acquisition approvals;

- Examination process;

- Reinsurance/ Bulk Reinsurance approvals.

---

## NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS (NAIC), 1986 – 1990.

Concurrent with his service as Iowa Insurance Commissioner, Mr. Hager served as a member of the NAIC. The NAIC is an organization of the insurance commissioners of all 50 states and meets regularly in locations throughout the U.S. to consider and evaluate national insurance issues. The NAIC considers all major insurance issues and formulates responsive model insurance laws and regulations, which are then routinely (but optionally) adopted at the individual state level. In addition, the NAIC promulgates and updates the key insurer financial reporting format, namely the NAIC Annual Statement Blank. The organization is based in Kansas City, Missouri and is staffed by well over 100 personnel.

**NAIC Chairmanships – Chairman of the Midwest Zone.** Mr. Hager was elected by his fellow Insurance Commissioners from the Midwest Zone (composed of the Midwest states, constituting about one quarter of all of the states) to provide leadership and representation of the Midwest before the balance of the states. This position included a position on the Executive Committee of the NAIC as well as major responsibilities relating to the assignment of states (and their related examiners) to specific examinations, both triennial and Market Conduct.

**NAIC Leadership: Member of the Executive Committee.** Mr. Hager also served as an elected member of the Executive Committee of the NAIC, the body that served as the steering committee of the organization, providing leadership between full membership meetings and providing recommendations to the full membership as to complex or politically charged issues within the organization.

**NAIC Chairmanships – Chairman of the Life Insurance Committee.** As a member of the NAIC, Mr. Hager served as both Vice Chairman and Chairman of the NAIC Life Insurance Committee. The charge of this Committee was oversight over all issues relating to life insurance products (including illustrations) as well as life insurers. This position and my four years of service at the NAIC exposed me to Mr. Hager to all aspects of life insurer operations and responsibilities.

**NAIC Chairmanships: Chair of the Universal Life Insurance** Task Force. In addition to chairing the Life Insurance Committee, Mr. Hager also chaired the Universal Life Insurance Task Force. The responsibility of this Committee included oversight of emerging life insurance products such as universal life.

**NAIC Chairmanships: Chair of the Life Insurance Product Development Task Force.** Mr. Hager also chaired the Life Insurance Product Development Task Force. While chairman of this task force, he led the development of model disclosure statements for universal and indeterminate premium life products designed to assist consumers in their comparison of different types of interest sensitive life insurance products, after a survey of the states determined regulatory problems existed with these products.

**NAIC Chairmanships Chair of the Financial Services and Insurance Regulation Task Force.** Mr. Hager also served as Chair of the Financial Services and Insurance Regulation Task Force and Member of the Executive Committee. Working with the other U.S. financial industries, this Task Force had responsibility to reconcile issues relating to non-insurance financial matters (e.g., banking and securities) in their intersection with insurance and insurance regulation.

**NAIC** – Other Committees. In addition, he also served on the following NAIC committees:

- Member, the Blanks Committee
- Member, Guarantee Fund Committee
- Member, Rehabilitator and Liquidators Committee
- Member, Casualty Actuarial Committee
- Member, Commercial Lines Committee
- Member, Valuation of Securities Committee,
- Member, International Insurance Relations Committee  • Member, Accounting Practices and Procedures Committee and
- Member, State and Federal Legislative Committee.
- Specific expert skills in regard to NAIC include:
- Eight years of direct hands on experience at the NAIC as a regulator
- Very familiar with the NAIC mechanisms
- Conversant with and adept at applying NAIC publications to litigation (e.g., Examination Manuals; Liquidation Manuals; Accounting Manuals; SVO Office, etc.)
- Working with recognized regulatory focused CPA's, Mr. Hager is able to provide specific and finite insurance/liquidation accounting expert testimony.

**Ongoing Regulatory Involvement.** In the years since leaving the regulatory ranks, he has continued to be closely involved with the NAIC and the regulatory community. As President and CEO of NCCI, he was in regular attendance at meetings of the NAIC and continues to currently attend these meetings and to be actively engaged with the regulatory process.

---

**PRACTICING ATTORNEY, HAGER & SCHACHTERLE**
DES MOINES, IOWA - 1983 to 1986

Following his time in Washington, D.C., Mr. Hager returned to Des Moines and opened his own law firm in 1983. The firm specialized in corporate insurance, regulatory insurance and employee benefit matters. The firm also provided general legal services. Mr. Hager represented numerous clients (companies and agents) in regulatory matters before the Iowa Insurance Department. Representative matters included:

- Policy forms approval
- Rate approval
- Insurer disciplinary matters
- Agent disciplinary matters, and
- Insurer merger acquisition and holding company matters

Mr. Hager also lobbied on behalf of insurers at the state legislature and NAIC level. Representative clients included the:

- Property Casualty Insurance Association of America ("PCIAA");
- The Iowa Professional Insurance Agents Association (PIA), and the
- Iowa Association of Life Underwriters (IALU)

---

### GENERAL COUNSEL AND DIRECTOR OF GOVERNMENT RELATIONS
### AMERICAN ACADEMY OF ACTUARIES
WASHINGTON, D.C. - 1980 to 1983

Mr. Hager served as General Counsel and Director of Government Relations for all Academy activities, including advising on admissions, discipline, federal antitrust and general corporate law. He represented the 10,000 member organization before Congress (e.g., Senate Committees on Banking, Commerce, Finance and Labor, and House committees on Education, Labor, Energy, and Ways and Means). He also represented the Academy before federal regulatory agencies, including the:

- Pension Benefit Guaranty Corporation
- Health Care Financing Administration, and
- The United States Department of Labor
- His additional duties included daily monitoring and reporting of all Congressional and regulatory activities affecting the profession.

While at the Academy Mr. Hager was also chief staff support to the following Academy Committees/functions:

- Committee on Discipline
- Committee on Risk Classification
- Committee on Guides to Professional Conduct
- And several others

Mr. Hager worked with Academy committees that subsequently provided the impetus for the creation of a national actuarial standards board that later became the Actuarial Standards Board (ASB).

Specific expert skills in this position include:

- Author of "The Emerging Law of Actuarial Malpractice"
- Working knowledge of Actuarial Professional Standards, including conversance with the pronouncements of the Actuarial Standards Board
- Adherence of the particular work product (or professional ethics) to actuarial professional standards
- Applicable expert conclusions
- Knowledge of the organization and structure of the actuarial profession; the profession's players; and the interaction of actuarial science and insurance
- Ability to optimize actuarial malpractice and rate proposal cases o Cross examination assistance of opposing actuarial experts o Expert testimony as to standards (work product and ethics)

## CHIEF OF STAFF AT THE UNITED STATES CONGRESS
## U.S. HOUSE OF REPRESENTATIVES
WASHINGTON, D.C. - 1979 TO 1980

Mr. Hager served as Chief of Staff in Washington D.C. to Iowa Congressman Tom Tauke (Republican from Dubuque) for one year. His duties included the following:

- Coordinated district operations from Washington, D.C.
- Supervised office accounts
- Supervised district grant applications and
- Managed a staff of 14

## CHIEF DEPUTY, IOWA INSURANCE DEPARTMENT
## DES MOINES, IOWA 1976 TO 1978

Reported directly to Commissioner Herb Anderson. Mr. Hager supervised the following divisions within the Department:

**Life and Health Division.** The Life and Health Division was responsible for oversight of all life and health policy forms approvals as submitted by insurers. Additionally, this division was also responsibility for all related Life/Health rate change proposals.

**Property Casualty Division.** The Property Casualty Division was responsible of oversight of all property casualty policy forms approvals as submitted by insurers. Additionally, this division was responsible for all related property/casualty rate change proposals.

**Complaints Division.** This division was responsible for the processing and oversight of all consumer complaints received by the Insurance Department. In the Department's resolution of such complaints and where patterns of insurer and agent wrong doing arose, to prosecute the insurers/agents under the Iowa Administrative Procedures Act. Mr. Hager personally led the Administration Prosecution of scores of such cases.

**Agents Licensing Division.** This application was responsible for overseeing all agent-licensing applications.

In addition to the above, Mr. Hager supervised initiation of formal administrative actions relating to departmental rules, companies (i.e., mergers, holding company activities and disciplinary activity), and agents (i.e., disciplinary).

---

## IOWA ASSISTANT ATTORNEY GENERAL
DES MOINES, IOWA - 1975 TO 1976

Assigned to the Department of Insurance, serving as the Department's General Counsel. In that capacity, he:

- Represented the Department in all state and federal litigation;
- Prepared briefs for the Department's use in agency administrative hearing
- Provided day-to-day legal guidance to the Commissioner as to all relevant matters
- Prepared and issued Attorney General Opinions relative to insurance matters
- Interpreted state insurance law and regulations
- Prosecutor for APA hearings on behalf of the Insurance Department

---

## LEGAL COUNSEL TO THE REPUBLICANS, IOWA HOUSE OF REPRESENTATIVES
DES MOINES, IOWA - 1975 SESSION

Retained by the Republicans of the Iowa House of Representative as their legal counsel for 1975 Session. In this position, Mr. Hager provided legal counsel on all relevant caucus issues and provided the following staff support:

- Researched pending legislation
- Prepared memorandums in support of proposed legislation
- Provided legal advice, and
- Participated in bill drafting
- Worked the floor of the legislature as to specific legislation

---

## MATHEMATICS TEACHER, KALAKAUA INTERMEDIATE SCHOOL
KALIHI DISTRICT, HONOLULU HAWAII - 1970-1972

Taught junior high mathematics and Hawaiian history in a school with a significant population of Hawaiian students during academic years 1970-71 and 1971-72.

## EDUCATIONAL BACKGROUND

- University of Northern Iowa, Cedar Falls, Iowa
Bachelor of Arts degree, Secondary Mathematics Education, 1969
- University of Hawaii, Honolulu, Hawaii
Master of Education Degree, Psychological Counseling, 1972
- University of Illinois, Champaign, Illinois
Juris Doctor, 1974

## BAR ADMISSIONS AND OTHERS

Florida, by exam 2004;
Illinois, by exam 1975 (this license is currently in inactive status);
Iowa, by exam 1975;
United States Supreme Court 1978

Member, the Iowa State Bar Association, Sections[1] on:
- Administrative Law,
- Commercial and Bankruptcy Law,
- Corporate Counsel,
- Government Practice,
- Health Law,
- Litigation,
- Trade Regulation and
- Workers' compensation.

Member, American Bar Association, and Member of the following Sections:
- Administrative Law and Regulatory Practice,
- Antitrust Law,
- Health Law and
- Tort, Trial and Insurance.

Member, South County Bar Association, Palm Beach County, and Member of several Sections of the Florida Bar

## COMMUNITY

---

[1] Committee and section membership varies from year to year with each bar membership.

- Member of the Board and Past Vice Chairman of the Board, Boca Raton Regional Hospital
- Co-Chairman (w/ Beth and Mr. Richard Gold) of the 2001 American Cancer Society's Ball (Boca Raton)
- Ball Chairman (w/ Beth) 1999 Boca Raton Community Hospital
- Ball Co-Chair (with Beth and with Mike and Kathy Arts and John and Susan Welchel) of the 1998 Boca Raton Historical Society Ball
- Ball Chair (w/ Beth) of the 1997 American Heart Association Ball
- Board of Directors, National Conference of Christians and Jews of Southeast Florida
- Board Member, past Chair, Boca Raton Chamber of Commerce
- Member of the Session and current Stewardship Campaign Chairman, First Presbyterian Church (Delray Beach)
- Past Board Member, Past Chair, Florida Atlantic University Executive Advisory Board, College of Business
- Past Board Member, Past Campaign Chair, United Way of Palm Beach County
- Past Chair, March of Dimes Walk America
- Advisory Committee to the Board: Pinecrest School, Fort Lauderdale, Florida

---

## AWARDS

- Sun Sentinel Excalibur Award for Business Leaders in South Florida (awarded for excellent business practices)
- Silver Medallion Award, National Conference of Christians and Jews (awarded for ecumenical work in the community between all ethnic groups)
- Business of the Year (to NCCI), 1996 as CEO
- Scores of others

---

## PROFESSIONAL

- Partner, Silicon Beach Venture Capital, Inc., a venture capital firm located Boca Raton.
- Elected Councilman of the City of Boca Raton; term ran through 2009.

---

## AUTHOR

- Numerous Iowa Attorney General Opinions (1975-76)
- Antitrust Guide, American Academy of Actuaries (1982)
- Numerous other articles in various publications while General Counsel and Director of Government Relations to the American Academy of Actuaries (1980-1983)
- Numerous articles in various publications while Iowa Commissioner of Insurance (19861990)
- Author (and lecturer) of the Insurance Course of the Iowa Bar Review (@ 1985- 1991)
- Numerous Hearing Officer Decisions under the Iowa Administrative Procedures Act (19781980; 1986-1990)

- Numerous articles about the US Workers' compensation System while President and CEO of NCCI (1990-1997)
- Law Review Article: William D. Hager, *"The Authority of the States over Debtor Coercion by the Federal Savings and Loan Associations,"* 27 Drake Law Review 651 (1977)
- Law Review Article: William D. Hager and Paul Noel-Chretien, *"The Emerging Law of Actuarial Malpractice,"* 31 Drake L.Rev. 831 (1982)
- Law Review Article: William D. Hager & Larry Zimpleman, *"The Norris Decision, Its Implications and Applications,"* 32 Drake L. Rev. 913 (1983)
- Numerous other articles

## PRESENTATIONS

- Numerous presentations to various groups while Iowa Assistant Attorney General
- Numerous presentations to various groups while Iowa First Deputy Insurance Commissioner
- Numerous presentations to various actuarial organizations/programs while General Counsel and Director of Government Relations of the American Academy of Actuaries
- Numerous presentations to various groups/organizations while a practicing attorney in Des Moines
- Numerous presentations to various groups while Commissioner of Insurance
- Numerous presentations to various groups while President and CEO of NCCI
- Numerous presentations to the high technology community in recent positions

## PERSONAL

Bill resides in Boca Raton and is the proud father of two daughters, both graduates of the University of Florida (Go Gators!!); Bill is a highly marginal golfer, and he has taught Sunday School at the First Presbyterian Church in Delray Beach, where he has also served as an Elder.

## CONTACT INFORMATION

William D. Hager
President
Insurance Metrics Corporation
301 Yamato Road/
(aka NE 51st Street)
Suite 1240
Boca Raton, Florida 33431
T: (561) 306-5072
F: (561) 431-0596
E: bhager@expertinsurancewitness.com

Websites
Expert Insurance Witness
www.expertinsurancewitness.com

Workers' Compensation Expert
www.comppremiumwizards.com

Reinsurance Arbitrator
www.insurance-metrics.com

APPENDIX B

REPRESENTATIVE ARTICLES AND SPEECHES

WILLIAM D. HAGER

**William D. Hager**
Founder
Insurance Metrics Corporation
www.expertinsurancewitness.com

301 Yamato Road, Suite 1240
Boca Raton, FL 33431
561.306.5072
bhager@expertinsurancewitness.com

## Representative Articles and Speeches of William D. Hager

Mr. Hager has given many speeches and written scores of articles. Set out below is a representative sample of his articles and speeches.

### Law Review Articles

1. William D. Hager & Paul-Noel Chretien, "The Emerging Law of Actuarial Malpractice," 31 *DRAKE L. REV.* 831 (1982).

2. William D. Hager & Larry Zimpleman, The Norris Decision, Its Implications and Application, 32 *DRAKE L. REV.* 913 (1983).

3. William D. Hager, The Authority of the States Over Debtor Coercion By the Federal Savings and Loan Associations, 27 *DRAKE L. REV.* 651 (1977).

4. William D. Hager & James G. Leach, An Unsolicited Addition to the Wachtell, Lipton Takeover Response Checklist: The Merger of Revlon and McCarran-Ferguson, 41 *Federation of Insurance & Corporate Counsel* 189 (1991).

### Amicus Curiae Brief

5. Brief of Amicus Curiae American Academy of Actuaries, *Arizona Governing Comm. v. Norris*, 463 U.S. 1073 (1983)(No. 82-52).

### Conference Proceedings

6. William D. Hager, Actuarial Malpractice - Real and Otherwise, 31 Conf. of Actuaries in Pub. Prac. Proc. 334 (1981).

7. William D. Hager, Actuarial Malpractice - The Emerging Law and Growing Exposure, 32 Conf. of Actuaries in Pub. Prac. Proc. 480 (1982).

8. William D. Hager, The Emerging Law of Actuarial Malpractice, 32 Conf. of Actuaries in Pub. Prac. Proc. 496 (1982).

9. William D. Hager, Actuarial Liability, 35 Conf. of Actuaries in Pub. Prac. Proc. 627 (1985).

10. William D. Hager, The Emerging Law of Actuarial Malpractice, 35 Conf. of Actuaries in Pub. Prac. Proc. 643 (1985).

11. William D. Hager, The Workers' Compensation Crisis, 41 Conf. of Consulting Actuaries 351 (1992).

**Periodical Articles**

12. William D. Hager, Three Questions Regarding Enjoining Operations of RRGs and PGs, *Risk Retention Rep.*, Sept. 1989 at 155.

13. William D. Hager, Ohio Takes Leading Role in Tracking Workers Comp Fraud, *Bus. Courier*, Feb. 10, 1977.

14. William D. Hager, Breathe Life Into Safety Education Programs, *The Bus. J. of Jacksonville*, Oct. 21, 1996.

15. William D. Hager, Prepare Employees For Overseas Travel Risks, *The Bus. J. of Jacksonville*, Oct. 25, 1996.

16. William D. Hager, States Provide Incentives for Drug Free Workplaces: Workers Comp Offers Discounts, *Cincinnati Bus. Courier*, May 9, 1997.

17. William D. Hager, Return to Work Programs, *Rough Notes Rep.*

18. William D. Hager, Stress Busters Designed to Relieve On the Job Burnout, *Rough Notes Rep.*

19. William D. Hager, Quality Process in the Workplace, *Rough Notes Rep.*

20. William D. Hager, Modifying the Workplace to Eliminate Repetitive Stress Syndrome, *Rough Notes Rep.*

21. William D. Hager, Employers Should Take Precautions With Pregnant Workers, *Health Care Monthly*, May 9, 1997.

22. Megan Santosus, Cross Purposes, *CIO Mag.*, Nov. 1, 1994 (chronicling the technological transition Hager led while President of Nat'l. Council Comp. Ins. (NCCI), Boca Raton, Fla.).

23. William D. Hager, Lifting Awareness on Experience Ratings, *PRSIM Points* (WCSIT and ISDA, Springfield, Ill.), Spring / Summer 1996.

24. William D. Hager, The Workers' Compensation Crisis: Addressing the Real Problem, Spring 1992 F. of the *Cas. Actuarial Soc'y* 189.

25. William D. Hager, NCCI States Its Case, *Indep. Agents Mag.*, May, 1994.

26. Interview with William D. Hager, President, NCCI, in *BNA Workers Comp. Rep.*, Dec. 11, 1990 at 1.

27. William D. Hager, Introduction to Bruce N. Barge and John G. Carlson, the Executive's Guide to Controlling Health Care and Disability Costs (1993).

**Speeches**

28. William D. Hager, Perspectives of the Nineties, Address at Connecticut Insurance Day (Apr. 4, 1995).

29. William D. Hager, The State of Workers Compensation, Address at the American Association of State Compensation Insurance Funds Conference (Aug. 1993).

30. William D. Hager, The State of Workers Compensation, Address Before the Minnesota Chapter of the Chartered Property Casualty Underwriters Society (Nov. 4, 1993).

31. William D. Hager, Major Workers Compensation, Address Before the Chartered Property Casualty Underwriters Society (Nov. 8, 1995).

32. William D. Hager, Workers Compensation Fraud, Address at the American Risk and Insurance Association Annual Meeting (Aug. 11, 1997).

33. William D. Hager, Cycles in Workers Comp, Address at the American Association of State Compensation Insurance Funds Annual Conference (Aug. 18, 1997).

34. William D. Hager, NCCI: Enhanced Products and Services, Address at the Annual Corporate Advisory Board of the PMA Insurance Group (May 2, 1997).

35. William D. Hager, The State of Workers Compensation, Address at the Independent Insurance Agents of Iowa Convention (May 15, 1997).

36. William D. Hager, The Future of Rating Bureaus, Address at the Casualty Actuarial Society Spring Meeting (May 19, 1997).

37. William D. Hager, The State of Workers Compensation, Address Before the Maryland Workers Compensation Educational Association (Sept. 15, 1997).

38. William D. Hager, The Future of Workers Compensation, Annual Address at the Meeting and Annual Issues Symposium of NCCI (1991-1997).

39. William D. Hager, What State Departments of Insurance Should Expect from Casualty Loss Reserve Specialists. 1987 Casualty Loss Reserve Seminar.

40. William D. Hager, The Unfair Claims Practices Act – Sword and Shield; The Corporate Compliance and Executive Planning Super Conference - Governance: Sarbanes-Oxley and Beyond; (September 4, 2003).

41. William D. Hager, Actuarial Malpractice; The Conference of Consulting Actuaries; (November 3, 2003)

42. William D. Hager, Contributor and Periodic Guest as to Insurance Issues: the Nationally Syndicated Weekly Radio Show: It's Your Money with host Bill Bailey (2003).

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Surplus Lines Law Revisions  - proposed legislation;
2011 Session, Florida House of Representatives;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Modernization of the Florida Insurance Agents and Adjusters Laws  - proposed legislation;
2011 Session, Florida House of Representatives;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Reform of the Catastrophic Reinsurance Fund ("CAT") - proposed legislation;
2012 Session, Florida House of Representatives;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Workers Compensation High Deductible - proposed legislation;
2013 Session, Florida House of Representatives;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Modernization of the Florida Workers Compensation law – proposed legislation;
2013 Session, Florida House of Representatives;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Reform of the Catastrophic Reinsurance Fund ("CAT") - proposed legislation;
2013 Session, Florida House of Representatives;

Presentation to the House Insurance and Banking Committee;
Reform of the Catastrophic Reinsurance Fund ("CAT") - proposed legislation;
2012 Session, Florida House of Representatives;

"Securing Florida's Property Insurance Future"
Insurance Day Summit Bermuda 2013 Annual Conference
June 25-26, 2013
Hamilton, Bermuda

"Florida's 2013 Legislative Session and Florida's Future Insurance Market"
Florida Insurance Council 2013 Summer Symposium
June 9-11, 2013
Fort Lauderdale, Florida

"How the Florida Legislature is Building Infrastructure to Assure Optimum Out-Year
Commerce"
Economic Council of Palm Beach County, Board of Directors Meeting
June 12, 2013
Boca Raton, Florida;

Presentation to the Florida Insurance Counsel "State of Affairs of the Florida Insurance
Marketplace"
November 2014

Participation through a legislative panel, at a in
January 2014;
Moderated the panel on Worker's Compensation Insurance, State of the Florida Insurance
Marketplace; January, 2015;
Participated on the legislative panel Florida Chamber of Commerce annual pre-legislative
seminar; January, 2015
Presentation to the House Insurance and Banking Committee;
Presentation to the House Government Operations Appropriations Committee;
Presentation to the House Regulatory Affairs Committee;
Funding the Florida Catastrophic Storm Risk Management Center at Florida State University for
research and mitigation purposes;
2014 Session, Florida House of Representatives;

Lecturer at the Annual Florida State University College of Law Insurance Symposium on
Regulatory and Legislative Matters, March 2015

**Risk Retention Litigation**

43. *Frontier Insurance Company, Inc. et al. v. William D. Hager, Commissioner of Insurance
of the State of Iowa*, #F87-645-E (U.S. District Court for the Southern District of Iowa).

44. *Swanco Insurance Company v. Hager*, 877 F.2d 353 (8th Cir. 1989), cert. Denied, 493 U.S.
1057, 110 S.Ct. 866, 107 L.Ed. 2d. 361 (11th Cir. 1990).

APPENDIX C

CASES IN WHICH WILLIAM HAGER

HAS BEEN DEPOSED OR TESTIFIED

WITHIN THE LAST FOUR OR MORE YEARS

Aiken v. Allianz Life Insurance Company of North America, In the District Court of Oklahoma County, State of Oklahoma, Case 10-2560, D 5/14; T 8/14;

Alabama Municipal Insurance Corporation v. Alliant Insurance Services, Inc. F.K.A Driver Alliant Insurance Services, In the United States District Court Middle District of Alabama Northern Division, Case No. 2:09-cv-00928-WKW-CSC, 01/11 D; 03/11 T

Algeo vs. MassMutual Life Insurance Co.; In the U.S. District Court for the Northern District of OK; No. 4:05 cv 00734-TCK-FHM; Case No. CJ-2005-6714;

Alicia Diagnostic v. Maryland Casualty Company, 18th Judicial Circuit of Florida, Case No. 05-CA-1842-15-L, 01/11 D;

Argus Fire & Casualty v. American Superior Insurance Company; 11th Judicial Circuit of Florida; Case No 98-02512-CA 27; D;

Ario vs. Penn Treaty Network America Insurance Company, In the Commonwealth Court of Pennsylvania, Case No. 5 M.D. 2009, 11/10 D;

Arrowood v. TIG; 11th Judicial Circuit, Miami-Dade County, Florida, 12/11 D;

AXA Equitable v. Infinity Financial Group, United States District Court for the Southern District of Florida, Case No. 08-8611; 2/13 D;

American Home v. Victaulic, Arbitration, 1/15 D;

American National v. Baker, United States District Court for the District of South Carolina; Case 3:10-c-02074; 3/13 D;

Auto-Owners Ins. Co. v. Dean & Moore Ins., Inc.; Superior Court of Cherokee County, Georgia; Case No. 09-cv-2800; 8/13 D;

Baker County Medical v. US Bank, Circuit Court in and for Duval County, Florida, Case No. 2010-CA-7068; 7/13 D;

Bertelsen vs. Allstate Insurance Company; In the Circuit Court; Second Judicial Circuit; State of South Dakota; County of Minnehaha; Civ. 07-5112; 01/10 D; 01/12 T;

Blacke v. Healthy Alliance Life Ins. Co.; In the Circuit Court of St. Louis County, State of Missouri; Case No. 11-sl-cc-01359; 10/13 D;

Bowman vs. Medi Share; In the District Court for Creek County; State of Oklahoma; Bristow Division; Case No BCJ 2006 067; 08/07 D;

Bright v. Ohio National Life Assurance Co., United States District Court, Northern District of Oklahoma; Case No. CIV-11-475; 03/12 D;

Cayces Excavation vs. Florida Employers Insurance Service Corp; In the Circuit Court of the Twelfth Judicial Circuit; In and For Sarasota County, FL; Case No. 2000 CA 011039- NC; 01/10 D;

2

Charleswell v. Chase Manhattan Bank; District Court of the Virgin Islands; Case No. 01-cv-119; D 10/13;

Commerce and Industry Insurance Company vs. Bruce Olson Construction, Inc. et al; Superior Court of the State of California; In and For the County of Place; Tahoe Division; Case No TCV 1140; Davison One; 03/08 D T;

Curry vs. Mel Foster Company; In Iowa District; 03/10 D;

Dakota Truck Underwriters v. TrueNorth, Circuit Court of South Dakota, County of Minnehaha; 3/13 D;

Dale v. ALA Acquisitions, I Inc.; In the U.S. District Court for the Southern District of Mississippi; Jackson Division; C.A. No. 3:00 VC 359LN; D

Delorey v. Evanston Insurance Company, Circuit Court of the 13th Judicial Circuit, Florida, Case No. 05-4373, 01/11 D;

Delorey v. Markel Insurance Co. and Evanston Insurance Co; In the 13th Judicial Circuit; Hillsborough County, Florida; Case No. 05-4373; 01/11 D;

Divens vs. Lorin Grant Hobart; In the Circuit Court of the First Judicial Circuit; In and For Santa Rosa County, FL Case NO 05 531; 10/09 D;

DK Productions, Inc., et al vs. Employers Insurance Company of Nevada; District Court of Clark County Nevada; Case No. A466728; 06/06 T;

Evans v. Certain Underwriters at Lloyds of London, et al., 17th Judicial Circuit of Florida, Case No. 06-CACE-013343 (12), 11/10 D;

Exchange Financial, Inc v. Federal Insurance Company et al. al.; District Court of Iowa for Polk County; Case No. LACL 105 076; 11/08 D;

FalconTrust Group, Inc. vs. Zurich U.S., et al., Circuit Court of the 11th Judicial Circuit, Florida, Case Nos. 07-6199 CA 40 and 07-14016 CA 40, 10/08 D; 12/10 T;

Farm Bureau Mutual Ins Co. v. Mary Jaegar, District Court of Cherokee County, Kansas; Case No. 2011-cv-110; 04/12 D;

Farm Stores v. Zenith Insurance Co., In the 11th Judicial Circuit; Miami, Florida; case no. 99-25900-CA-01; 10/11 D;

Fort Benning v. American Management Services; In the Superior Court of Muscogee County, State of Georgia; Case No. SU10CV2025-F; 2/14 D;

Fox Haven v. Nationwide; United States District Court, Middle District of Florida, Case 2:13-cv-399; 10/14 D;

Gianzero v. Wal-Mart; In the United States District Court for the District of Colorado; Case No. 1:09-CV-006546; 07/11 D;

3

Glick vs. Tri Insurance Underwriters, Inc.; Circuit Court; 15th Judicial Circuit; Palm Beach County, FL; Case No. 502 007 CA 006495 XXXX MB Division AI; 02/09 D;

Gold v. State Farm; Circuit Court for Brevard County, Florida, 05-2011-ca-11196; 10/14 D;

Golding v. State Farm, 15th Judicial Circuit, Palm Beach County, Florida, Case No. 5028 CA 6652; 7/13 D;

Gray Insurance Company; 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana; No. 625124; 1/14 T;

Greene, Commissioner of Insurance, as Liquidator v. AMS Life Insurance Company; CV 1992-005232; Superior Court of Arizona, Maricopa County;  D;

Gressler vs. The Medical Protective Company; In the District Court; 116th Judicial District; Dallas County TX; Cause No 05-10027-F; 11/07 D;

Hazelton v. Sonic Automotive, Inc., 13th Judicial Circuit of Florida, Case No. 02- 12274, 01/11 D;

Hoffman v. Continental Casualty; In the United States District Court for the Western District of Oklahoma; Case No. 11-CV-911; 10/12 D;

Horowitz v. USAA, 15th Judicial District of Florida, Palm Beach County, Florida, Case No. 502011-cv-09597, 08/12 D;

In re Poe in Bankruptcy; In the US Bankruptcy Court; Middle District of FL; Tampa Division; Case NO. 06-bk-04292; 01/10 D;

In the Matter of Stockholm Town Mutual Ins. Co.; The Office of Commissioner of Insurance; Case No. 13-C35653; 2/14 D;

Koken vs. Deloitte & Touche LLP, In the Commonwealth Court of PA, Civil Action, Law; Docket NO 734 MD 2002; 08/07 D;

Kondracki v. Metro Taxi and Pinnacol Assurance, State of Colorado Office of Administrative Courts; W.C. No. 4-782-175; 04/11 T;

Krummell vs. North American Company; In the United States District Court for the Central District of CA; Case No. 08-01509; 04/10 D;

Kurtz vs. Ensz & Jester P.C. et al; In the Circuit Court of Jackson Co. Missouri at Independence; Case No 0716 CV 32494; 06/09 D;

Leporace v. New York Life and Annuity, United States District Court for the Eastern District of Pennsylvania, Case No. 11-2000, T 5/14;

Lloyds v. Millan, 11th Judicial Circuit, Miami-Dade County, Florida, Case No. 08-22674, 09/11 D;

Loukas v. Metropolitan Life Insurance Company; In the Judicial Circuit Court of FL; DT

4

Mercy Medical Center vs. Aultman Health Foundation; In the Court of Common Pleas; Stark County, Ohio; Case No. 2007-CV-05277; 03/10 D;

Midamar Inc. v. Firemen's Fund Insurance Company; In the Iowa District Court; County of Linn; Case No. LACV No. 053 826; 01/09 D;

Minke v. Bankwest; State of Minnesota District Court; 10th Judicial District; Case No. 86-cv-11-5806; 5/13 D;

Monogahela Power Company v. Certain Underwriters at Lloyds, In the Circuit Court for Washington County, Maryland, Case No 21-C-03-16733-DJ; 11/10 D;

Mortgage Payment Protection, Inc. vs. Cynosure Financial, Inc.; In the United States District Court; Middle District of FL; Orlando Division; Case No. 6:08-cv-1212-Orl-22DAB;

Niles vs. Christian Care Ministry, Inc; In the United States District Court for the Western District of Oklahoma; Case No. Civ. 09-20-l; 03/10 D;

Norych vs. Admiral Insurance Co; United States District Court Southern District of Florida; Case No 08- 60330; 12/09 D;

O'Daniel v. Hartford, United States District Court, District of South Dakota; Case No 11-5088; 1/13 D;

Olear Organization, Inc. v. Wells Fargo Ins.; In the 9th Judicial Circuit in and for Orange County, Florida; Case No. 2009-CA-034659; 11/11 D;

O'Leary v. National Life Insurance Co.; United States District Court Central District of California; Case No. 12-cv-06882; 10/13 D;

Premium Assignment Corporation v. Auto-Owners Insurance Co., In the Second Judicial Circuit; Leon County, Florida; Case no. 2010-ca-527; 02/13 D;

Penn Mutual Life Insurance Co. v. Jacqueline Hudkins; United States District Court Southern District of New York; Case No. 09-cv-7023; 05/11 D;

Petro v. Travelers, United States District Court for the Northern District of Florida; Case 3:12-cv-491; 7/13 D;

PHL Variable v. Price Dawe, United States District Court for the District of Delaware, Case 10-964; 1/13 D;

Poe Insurance Managers, Debtor; In the United States Bankruptcy Court; Middle District of FL; Case No. 06-bk-04292-CPM; 05/10 D;

PW Shoe Lofts v. State Auto, Circuit Court of St. Louis City, State of Missouri, Case No. 1022-CC1156301, 12/12 D; 2/13 T;

Redding v. ProSight Specialty; United States District Court for the District of Montana; Case No. CV-12-98-H-CCL; 11/13 D;

5

Reed v. AMCO Insurance Co.; United States District Court District of Nevada; Case No. 3:09-cv-00328; 05/11 D;

Delia Reyes v. Infinity Indemnity Insurance Company, In the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, Case 13-19660, D 7/14;

Ross v. Scottsdale, Circuit Court of St. Louis County, State of Missouri, Case 2107cc-01454; 5/12 D;

Roush v. Liberty Mutual, United States District Court, Middle District of North Carolina, Case No. 1:09-cv-472; 05/12 D;

Sadel vs. Berkshire Life Insurance Company of America; In the United States District Court for the Eastern District of PA; Case No. 2:09-cv-00612-MSG; 05/10 D;

SeaBright v. Euro Paint; In the Court of Common Pleas of Mahoning County, Ohio, 2012 cv 3023 D 11/14;

Sea Oaks vs. Indian Harbor Insurance Co.; In the Circuit Court; In and For Indian County, FL; 10/09 D;

Sentry Insurance et al vs. John Bond Atkinson; In the Circuit Court for Hillsborough County FL; Case No 05 09466; 03/08 D;

Settlement Funding, LLC v. AXA Equitable Life Insurance Co., In the United States District Court for the Southern District of New York, Case No.: 09-CV-8665-HB, 09/10 D; 10/10 T;

Slone v. Liberty Mutual; Commonwealth of Kentucky; Perry Circuit Court; Case No. 11-ci-140; 1/14 D;

Sokhoeun Say vs. Keith C. Graves; In the Circuit Court of the fourth Judicial Circuit In and For Duval CO. FL; Case No. 16-2008-CA-010157; 11/09 D;

State Farm Lloyds Appeal Before the Commissioner of Insurance re Rates for Residential Property Insurance; TDI Docket NO. 2562 A; 06/09 D;

State of Connecticut vs. Acordia, Inc.; In the Superior Court Judicial District of Hartford at Hartford; Doc No HHD CV 402 731 4S (X09); 12/09 DT;

State of Florida vs. Brent Tyler Atkinson; In the Circuit Court of the 20th Judicial Circuit In and For Charlotte Co. FL; Criminal Action; Case No. 08-0001 73 CF (JFP); 06/09 D;

State of Florida, Department of Financial Services, Office of Insurance Regulation vs. Assured Premium Finance Corp; In the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida; Subsidiary Case No. 02-1128-C;

Stokes vs. Life Insurance Company of North America; United States District Court for the District of Idaho; Case No CV 06 411 S LMB; 05/08 D;

Thompson v. State Farm Insurance Company, 10th Judicial Circuit of Florida, Case No. 2008 CA004802, October 22, 2010, State Farm/Thompson, 09/10 D;

Tiara Condominium Association vs. Marsh USA Inc.; Case No 08 CV 80254; United States District Court; Southern District of FL.; Case No 08 CV 80254; 11/08 D; 12/13 D;

6

Tome v. State Farm Fire and Casualty Co., In the Circuit Court of the 15th Judicial Circuit; Palm Beach County, Florida; Case No. 502008CA18853; 01/11 D;

U.S. v. Dennis Siamis; In the U.S. District Court for the Northern District of Iowa; T 05/06;

U.S. vs. Keith LaMonde et. al; U.S District Court; Middle District of Florida; Criminal Division; Case No. 6:05-cr-131-Orl-19KRS; 12/07 T;

U.S. Bank v. PHL Variable, United States District Court for the District of Minnesota, Case No. 12-CV-0877; 5/13 D;

U.S. Bank v. PHL Variable Insurance Company, United States District Court Central District of California, Case No. CV-12-03046; T 4/13;

Warren v. CUNA, United States District Court for the Eastern District of Oklahoma, Case No. 11-439; 11/12 D;

Wells Fargo v. American General Life Ins. Co., 153rd District, Tarrant Co., Texas, Case No. 153-247206-10, 3/12 D;

West Coast Insurance Company vs. Life Brokerage Partners; In the United States District Court for the Southern District of FL; Case No. 08-80897-Civ; 04/09 D;

Wray v. Security National, Miami-Dade Circuit Court, Case No. 09-83024 CA 27, 12/12 D;

Wrubel v. John Hancock Insurance Company, USDC Eastern District of New York, Case No. 11-cv-01873, 7/12 D;

**End of document.**

APPENDIX "D"

## Documents Reviewed

1. Documents produced in case, Bates No. AMERICAN K-9 000001 through 002490; Bates No. AMERICAN K-9 0002491 through 004841; Bates No. AMERICAN K-9 004889 through 006617; Bates No. CTRL000001 through CTRL0000152; Bates No. CTRL0000153 through CTRL0000158_01.

2. Florida and Virginia rules and regulations.

3. Longshore and Harbor Workers' Compensation Act and amendments thereto.

4. Second Amended Complaint.

5. Answer thereto.

6. All of those documents referenced in this report.

7. Virginia and Florida rules and regulations.

8. The Virginia and Florida Insurance Code.

9. National Association of Insurance Commissioners (NAIC) materials as utilized by the Florida Office of Insurance Regulation and the Virginia Bureau of Insurance.

10. Insurance policies.

11. Deposition of Carla Bermudez-Rivera taken on February 27, 2012.

12. Deposition of Sara Payne taken on August 1, 2013.