**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

AMERICAN K-9 DETECTION
SERVICES, INC.; and AMERICAN K-9
DETECTION SERVICES LLC,

               Plaintiffs,

v.                                       Case No. 6:14-cv-1988-Orl-37TBS

RUTHERFORD INTERNATIONAL,
INC.; and SARA PAYNE,

               Defendants.
_____

**ORDER**

This cause is before the Court on the following:

1.     Defendants' *Daubert* Motion to Preclude the Testimony of Plaintiffs'
Purported Expert, William Hager, and Memorandum of Law in Support
(Doc. 65), filed January 15, 2016;

2.     Plaintiffs' Memorandum of Law in Opposition to Defendants' Daubert Motion
to Preclude the Testimony of Plaintiffs' Purported Expert, William Hager
(Doc. 77), filed February 1, 2016;

3.     Defendants' Motion for Summary Judgment Based on Statute of Limitations
and Memorandum in Support (Doc. 55), filed October 20, 2015;

4.     Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for
Summary Judgment Based on Statute of Limitations (Doc. 69), filed
January 19, 2016;

5.     Defendants' Reply Memorandum in Support of their Motion for Summary
Judgment Based on the Statute of Limitations (Doc. 75), filed January 29,

2016;

6.  Plaintiffs' Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 67), filed January 15, 2016;

7.  Defendants' Response in Opposition to Plaintiffs' Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 79), filed February 12, 2016; and

8.  Plaintiffs' Reply Memorandum in Support of its Motion for Summary Judgment (Doc. 82), filed February 26, 2016.

## BACKGROUND

This action involves a dispute over the interpretation of representations made by Defendants via e-mail in November 2009 regarding the availability of Defense Base Act ("**DBA**") insurance coverage[1] for a contract awarded to Plaintiffs, funded by the Government of Canada, and performed in Kandahar, Afghanistan ("**Canadian Contract**"). (*See* Docs. 30, 45.)  Presently, there are three questions before the Court: (1) whether Plaintiffs' expert, Mr. William Hager ("**Mr. Hager**"), may opine as to the standard of care that a reasonable broker would have exercised under the circumstances (Doc. 65); (2) whether Plaintiffs' claims against Defendants are barred by the applicable four-year statute of limitations ("**SOL**") (Doc. 55); and (3) if not time-barred, whether Plaintiffs are entitled to judgment as a matter of law on these claims (Doc. 67). Upon

---

[1] Pursuant to 42 U.S.C. § 1651(a), DBA insurance extends workers' compensation coverage to employees working on air, military, and naval bases outside the continental United States. *ITT Base Servs. v. Hickson*, 155 F.3d 1272, 1274 (11th Cir. 1988). At all relevant times, Plaintiffs were obligated to provide its employees with "insurance comparable to DBA insurance." (*See, e.g.*, 76-13, p. 6; *see also* Doc. 56-3, p. 13.))

consideration, and for the reasons memorialized in this Order, the Court answers the first question in the affirmative and the second and third questions in the negative.

## I.    The Parties

Plaintiffs—American K-9 Detection Services, Inc. and American K-9 Services, LLC (collectively, "**AMK9**")—are in the business of providing canine detection and security services. (Doc. 67-2, ¶ 4.) Pursuant to domestic and international contracts, AMK9 trains and places working dog teams, including patrol teams, narcotic teams, cadaver teams, and explosive teams. (*Id.*) AMK9 represents that, from May 21, 2008, until April 2011, Defendants—Rutherford International, Inc. ("**Rutherford**") and former Rutherford employee Sara Payne ("**Ms. Payne**") (collectively, "**Defendants**")—were its exclusive DBA insurance brokers. (*Id.* ¶ 5; *see also* Doc. 30, ¶ 12; Doc. 45, ¶ 12.) Defendants admit that: (1) their relationship with AMK9 began on May 21, 2008; (2) Ms. Payne was an employee of Rutherford; (3) AMK9 contacted Ms. Payne regarding placing insurance; and (4) Ms. Payne has experience placing DBA insurance for clients. (Doc. 79, p. 6; Doc. 45, ¶ 12.) Defendants, however, deny having any client relationship with AMK9 after December 1, 2009. (Doc. 79-1, p. 6.)

Carla Bermudez-Rivera ("**Ms. Bermudez**") is a former employee of AMK9, who was involved in procuring DBA insurance policies through AMK9's insurance broker. (Doc. 67-3, ¶ 2.).   At all relevant times, Ms. Bermudez communicated directly with Ms. Payne regarding the procurement of a DBA insurance policy. (*See generally* Doc. 67-3.)

## II.     2009 E-mail Communications

In October 2009, ACE American Insurance Company ("**ACE**") was providing DBA insurance for a security-services contract between AMK9 and Compass Integrated Security Solutions (Doc. 80-1 ("**Compass Contract**")) ("**Compass DBA Policy**").[2] (Doc. 67-2, ¶ 6.)  Around that time, Ms. Payne advised Ms. Bermudez—via e-mail—that, due to AMK9's history of losses, ACE had declined to renew the Compass DBA Policy and, therefore, AMK9 would need to move its DBA insurance for the Compass Contract from ACE. (*Id.*; Doc. 79-1, ¶ 7; *see also* Doc. 80-17, p. 6.) During these e-mail communications, Ms. Bermudez and Ms. Payne discussed the availability of alternative DBA coverage for the Compass Contract. (Doc. 80-17, pp. 4–6; Doc. 79-1, ¶¶ 7–11.)

In November of 2009, Ms. Bermudez told Ms. Payne that AMK9 needed to procure insurance for its Canadian Contract. (Doc. 67-2, ¶ 7; *see also* Doc. 80-17, pp. 2-3.) AMK9 represents that Ms. Payne incorrectly advised Ms. Bermudez that DBA insurance was not available for projects that were not funded by the United States Government ("**USG Requirement**") and consequently, that DBA insurance was not available for the Canadian Contract ("**Representations**").[3] (Doc. 67-2, ¶ 7, *see also* Doc. 80-17, pp. 2–6.) AMK9 also maintains that Defendants never advised it that there may be exceptions to the USG Requirement. (Doc. 67-2, ¶ 8; Doc. 67-3, ¶ 7.)

---

[2] The Compass DBA Policy was set to expire on December 1, 2009. (Doc. 80-6, p. 2.)

[3] Ms. Bermudez also contends that Ms. Payne informed her again in a subsequent telephone conversation that DBA insurance was unavailable for contracts that were not funded by the USG. (Doc. 67-3, ¶ 5.) Ms. Payne disputes this. (Doc. 79-1, ¶ 24.)

According to Defendants: (1) Ms. Payne informed Ms. Bermudez that she would need a copy the Canadian Contract determine the availability of DBA coverage (Doc. 79-1, ¶ 14); and (2) AMK9's interpretation of the Representations fail to account for the distinction between program and non-program DBA coverage (*see id.* ¶¶ 3–4, 6–7, 13).[4]   It is undisputed that Ms. Bermudez never provided Ms. Payne with the Canadian Contract. (Doc. 67-3, ¶ 5; Doc. 79-1, ¶ 16.)

## III.    Personal Accident Policy

In light of the Representations, Ms. Payne advised Ms. Bermudez that AMK9's only coverage option for the Canadian Contract was a personal accident policy from Lloyd's of London ("**PA Policy**"). (Doc. 67-2, ¶ 9; Doc. 67-3, ¶ 4; *see also* Doc. 80-18, pp. 2, 6.) Based on Defendants' advice, in February 2010, AMK9 obtained the PA Policy through another broker—Culver London Limited ("**Culver**"). (Doc. 67-2, ¶¶ 9, 11; *see* Doc. 76-12.) The PA Policy was issued for a one-year period beginning on February 17, 2010, and ending on February 16, 2011 ("**PA Coverage Period**"). (Doc. 76-12, p. 4.) The PA Policy provided medical, evacuation, and repatriation benefits up to $250,000 per person and disability benefits up to 300,000 per person. (*Id.*; Doc. 67-2, ¶ 21.)

---

[4] According to Ms. Payne, "[p]rogram DBA coverage refers to specific United States contracts involving particular government agencies," and "[e]very contract under a program DBA policy must be funded by the [USG]." (Doc. 79-1, ¶ 4.) Alternatively, Ms. Payne represents that "[n]on-program DBA coverage does not involve any of these [U.S.] agencies," and "there is a significant 'grey area' [as to] whether DBA is available for non-USG funded contracts," which is "fully dependent on a carrier being willing to cover a particular contract." (*Id.* ¶ 6.)

### IV.    Employee Injuries in Afghanistan

In May and August of 2010, three of AMK9's dog handlers were injured in Afghanistan while performing work under the Canadian Contract ("**Injuries**"). (*Id.* ¶¶ 16–18.) Lloyd Williamson ("**Mr. Williamson**") and John Logie ("**Mr. Logie**") were injured on May 25, 2010, and Richard Cicero ("**Mr. Cicero**") was injured on August 4, 2010. (*Id.*) The Injuries occurred during the PA Coverage Period (see Doc. 76-12, p. 4; Doc. 67-2, ¶¶ 16-18); however, AMK9 did not have DBA insurance at the time of the Injuries (*see* Doc. 67-2, ¶ 15).

AMK9 advanced costs "to assure that all appropriate care was given to [Mr. Williamson, Mr. Logie, and Mr. Cicero] while the insurance process was administered," including costs for the payment of Mr. Cicero's salary, which AMK9 was contractually obligated to pay. (Doc. 67-2, ¶¶ 16–18, 22.)  AMK9 represents that it used the PA Policy to pay for the initial medical care and treatment of Mr. Cicero. (*Id.* ¶ 20.) Finally, on October 10, 2011, AMK9 paid Mr. Cicero a lump sum of $300,000 in temporary disability benefits under the PA Policy. (*Id.* ¶ 22.) In light of Ms. Bermudez's testimony that the PA Policy only paid for fifty percent of an employee's net salary, beginning after a thirty-day waiting period, Defendants dispute that AMK9 was reimbursed for its advancement of Mr. Cicero's salary under the PA Policy. (Doc. 75, pp. 8–9; Doc. 176-14, p. 176; *see also* Doc. 76-12, p. 4.)

### V.    Procurement of DBA Insurance

AMK9 subcontracted some of its work under the Canadian Contract to RONCO Consulting Corporation ("**RONCO**"). (Doc. 67-2, ¶ 10.)  On or about August 4, 2010, AMK9 discovered that RONCO had obtained DBA coverage through Ms. Payne for the

same Canadian Contract. (*Id.* ¶ 13.) The next day, AMK9 contacted Defendants to request DBA insurance for the remainder of the Canadian Contract. (*Id.* ¶ 14.) The coverage was procured. (*See id.* ¶ 5.) However, a DBA policy for the Canadian Contract was not bound and made effective until August 12, 2010. (See *id.*)

## VI.   Department of Labor Proceedings and Subsequent Lawsuit

According to the U.S. Department of Labor ("**DOL**"), under the DBA, injured employees are required to give written notice of their injuries to the Office of Workers' Compensation Programs ("**OWCP**") within thirty days. (Doc. 80-3, p. 15; *see also* Doc. 67-2, ¶ 28.) Additionally, injured employees may file a claim for compensation with the OWCP within the later of one year after: (1) the date of injury; or (2) the last payment of compensation. (Doc. 80-3 at 11.) If an employer fails to secure payment of compensation as required by the DBA, an injured employee may elect to sue the employer for tort damages arising from his or her injuries. (*Id.* at 13.)

Pursuant to its statutory obligations, on August 25, 2010, AMK9 engaged attorney Keith Flicker ("**Mr. Flicker**") and his law firm—Flicker, Garelick & Associates, LLP— to advise, represent, and assist AMK9 in connection with Mr. Cicero's submission of his DOL claim for DBA benefits.[5] (*Id.* ¶ 27.) On December 22, 2010, Mr. Cicero commenced a proceeding with the DOL seeking DBA benefits ("**DOL Proceeding**"). (*Id.* ¶ 30.) After filing suit against AMK9 in state court on June 23, 2011 ("**Cicero Lawsuit**") (*id.* ¶ 32), Mr. Cicero voluntarily dismissed the DOL Proceeding on September 13, 2011 (*id.* ¶ 30.)

---

[5] AMK9 represents that the DOL first had to determine whether Mr. Cicero's claim was DBA eligible before addressing the question of whether AMK9 had DBA insurance. (Doc. 67-2, ¶ 28.)

The Cicero Lawsuit was ultimately resolved through a confidential settlement agreement on September 13, 2013. (*Id.* ¶ 30.)

## VII.    This Action

Dissatisfied with the handling of its requests for DBA insurance on the Canadian Contract, AMK9 initiated this action in state court on October 27, 2014. (Doc. 1, ¶ 1.) Defendants later removed the action to this Court on the basis of diversity jurisdiction. (Doc. 1.) In its Second Amended Complaint ("**SAC**"), AMK9 asserts four claims against Defendants for: (1) negligent failure to procure insurance ("**Count I**"); (2) breach of fiduciary duty ("**Count II**"); (3) breach of contract ("**Count III**"); and (4) negligent misrepresentation ("**Count IV**"). (Doc. 30.)

The parties have now filed cross-motions for summary judgment (Docs. 55, 67), and Defendant has filed a *Daubert*[6] motion to exclude the testimony of AMK9's purported expert, Mr. Hager (Doc. 65) (collectively, "**Motions**"). The Motions have been fully briefed. (*See* Docs. 69, 75 (response and reply to Defendants' motion for summary judgment); Docs. 79, 82 (response and reply to AMK9's motion for summary judgment; Doc. 77 (response to Defendants' *Daubert* Motion).) On April 1, 2016, the parties appeared before the Court for oral argument on the Motions ("**Hearing**"). (Doc. 90.)  As indicated above and explained below, neither party has prevailed on its motion for summary judgment; thus, the Court will hold the final pretrial conference on May 12, 2016, as scheduled.[7] (Doc. 61.)

---

[6] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[7] A jury trial is presently set for the June 6, 2016, trial term. (Doc. 26, p. 2.)

## THE *DAUBERT* MOTION

### I.   Standards

In its gatekeeping role, a district court is tasked to ensure that juries only hear "expert" opinions that satisfy the following requirements:

**Qualifications**—a witness that is "qualified as an expert by knowledge, skill, experience, training, or education" may testify as to his opinions of scientific, technical, or other specialized knowledge (Rule 702) ("**Qualification Requirement**");

**Reliability**—the testimony is "based upon sufficient facts or data" (Rule 702(b)) and "is the product of reliable principles and methods" (Rule 703(c)), which the witness applied "reliably to the facts of the case" (Rule 702(d)) ("**Reliability Requirement**"); and

**Helpfulness**—the testimony will help the jury to "understand the evidence or to determine a fact in issue" (Rule 702(a)) ("**Helpfulness Requirement**").

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998); *see also Cooper v. Marten Transp., Ltd.*, 539 F. App'x 963, 965–67 (11th Cir. 2013). Importantly, the Court must eschew credibility determinations and any assessment of the merits of an expert witness's opinion—which are matters exclusively reserved to juries—and must instead narrowly focus on whether the proponent of the expert witness has established the Qualification, Reliability, and Helpfulness Requirements. *See Daubert*, 509 U.S. at 594–95; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 155 (2000).

To determine whether the Qualification Requirement is met, "courts generally look to evidence of the witness's education and experience and" determine whether such qualifications and expertise sufficiently "fit" with "the subject matter of the witness's proposed testimony." *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*,

711 F. Supp. 2d 1348, 1367 (M.D. Ga. 2010) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).

A determination on the Reliability Requirement requires consideration of a plethora of factors, which vary depending on the opinions and testimony at issue, including the following well-known *Daubert* factors:

(1)     whether the expert's theory can be or has been tested;

(2)     whether the theory has been subject to peer review and publication;

(3)     the known or potential rate of error of the particular scientific technique; and

(4)     whether the technique is generally accepted in the scientific community.

*Daubert*, 509 U.S. 579; *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). The factors pertinent to an analysis of the Reliability Requirement—including the *Daubert* factors—"are only illustrative and may not all apply in every case." *United States v. Abreu*, 406 F.3d 1304, 1307 (11th Cir. 2005). The district court must identify the pertinent factors, and the court is accorded "wide latitude in deciding how to determine reliability." *Id.*

Finally, the Helpfulness Requirement turns on

> the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*See* Fed. R. Evid. 702, Advisory Committee Notes (citation omitted).

The burden of establishing admissibility is borne by the party offering the expert opinion—the proponent. *See Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)); *see*

*also Frazier*, 387 F.3d at 1260. The proponent does not have to prove that the opinion is scientifically correct, just that it is reliable and helpful. *See Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1279 (M.D. Fla. 2002) (citing Fed. R. Evid. 702, Advisory Committee Notes). If the proponent does so, then the court should open the gate by permitting the proponent to elicit testimony from the expert witness concerning his or her reliable opinions and by allowing the jury to fulfill its role of determining the weight to accord such testimony. Indeed, the Court's limited gatekeeping role "is not intended to supplant" presentation of contrary evidence to the jury or the practice of cross-examination in a courtroom. *See United States v. Ala. Power Co.*, 730 F.3d 1278, 1282–85 (11th Cir. 2013). Accordingly, once the proponent satisfies the minimum threshold for admissibility, the parties' remaining reliability and relevance disputes must be decided by the jury—preferably based on the litigants': (1) presentation of contrary evidence, such as testimony from the litigant's own expert witness providing both contrary opinions and criticism of—among other things—the opposing expert's qualifications and the inaccuracy or unreliability of his or her opinions; and (2) use of cross-examination and appropriate legal argument. *See id.*; *see also Costa v. Wyeth, Inc.*, No. 8:04-cv-2599-T-27MAP, 2012 WL 1069189, at *2 (M.D. Fla. Mar. 29, 2012).

## II.   Discussion

As set forth in his expert report ("**Report**"), Mr. Hager offers several opinions as to the obligations that existed between the parties. (Doc. 66-2, pp. 11–12.) First, Mr. Hager opines that: (1) as insurance agents, Defendants had an obligation to use reasonable care in procuring DBA insurance for AMK9 and in explaining the coverage placed for AMK9; (2) as a result of the Representations, Defendants breached their obligations to

AMK9; (3) Defendants knew or should have known that their Representations were erroneous; (4) upon discovering that their Representations were erroneous, Defendants were obligated to immediately correct them; and (5) if Defendants had accurately advised AMK9 regarding the availability of DBA coverage—or advised AMK9 when it learned of its error—the Injuries would have been covered under DBA insurance. (Doc. 66-2, p. 11.) Additionally, Mr. Hager opines that the parties had a special relationship because: (1) Defendants held themselves out as experts in the field of DBA insurance; (2) the parties had a long working relationship with respect to DBA insurance; (3) Defendants had in-depth knowledge of AMK9's insurance needs and responsibilities; and (4) Defendants had previously assisted AMK9 in procuring DBA coverage, particularly by providing AMK9 with written information as to its insurance coverage needs. (*Id.* at 11–12.) Based on this special relationship, Mr. Hager opines that Defendants had additional obligations to AMK9 and breached these heightened obligations by: (1) failing to properly advise AMK9 as to the availability of DBA insurance; and (2) failing to procure coverage to meet AMK9's needs. (*Id.* at 11.) Defendants challenge Mr. Hager's qualifications and maintain that his opinions fail to meet the reliability and helpfulness factors under *Daubert*. (Doc. 65.)

### A.     Qualification Requirement

Defendants first contend that Mr. Hager does not meet the Qualification Requirement under *Daubert* because: (1) he has never been a broker or an agent; (2) he has not consulted with any reasonably prudent broker or agent concerning any issues in the case; and (3) he has been disqualified by a number of federal judges ("**Disqualification Rulings**"). (Doc. 65, pp. 4–10.) The Court disagrees.

As an initial matter, the Court finds that many of the Disqualification Rulings cited by Defendants are factually distinct from the instant action. First, in *Nova Casualty Co. v. Waserstein*, Mr. Hager's testimony was excluded on the ground that the policy he sought to interpret was not ambiguous; thus, expert opinion testimony was unnecessary. No. 04-207550-CIV, 2005 WL 5955694, at *1, *2 (S.D. Fla. Sept. 7, 2005). Indeed, the *Nova* court explicitly stated that "the issue [was] not whether Mr. Hager [was] qualified or whether his methodology [was] reliable." *Id.* at *2. Rather, because the policy was unambiguous, the *Nova* court found that his testimony would not be helpful to the trier of fact. *See id.*

Also distinguishable are the courts' rulings in *Sadel v. Berkshire Life Insurance Company of America*, No. 09-612, 2011 WL 292239 (E.D. Pa. Jan. 31, 2011), *aff'd*, 473 F. App'x 152 (3d Cir. 2012) and *Old Line Life Insurance Company v. Brooks*, No. 3:05-cv-722, 2007 WL 892448 (S.D. Miss. Mar. 21, 2007). Mr. Hager's qualifications were also not at issue in *Sadel* or *Brooks*. Rather, the *Sadel* court excluded Mr. Hager's testimony because the facts in the record did not support his opinion. *See* 2011 WL 292239, at *12. The *Brooks* court excluded Mr. Hager's testimony because he offered improper legal conclusions. 2007 WL 892448, at *8–9.

*Tiara Condominium Association, Inc. v. Marsh & McLennean Companies, Inc.*, No. 9:08-cv-80254-Hurley (S.D. Fla. 2014) is the only cited case that is analogous to the instant action. However, the Court disagrees with the *Tiara* court's Disqualification Ruling, which implied that the Qualification Requirement would be met only by brokers and those with broker's experience. (*See* Doc. 66-8 (providing a transcript of the Disqualification Ruling in *Tiara*).) Here, the Court finds that provided that an expert is otherwise qualified,

he or she is not required to be a broker, or have experience as a broker, to speak the standard of care of a broker.

Under Federal Rule of Evidence 702, an expert is qualified based on a blend of his knowledge, skill, experience, education, and training. A review of Mr. Hager's resume and Report reveals that he has extensive insurance experience, including the representation of agent and insurer interests as attorney and a position as the former chief executive officer of the National Council on Compensation Insurance (NCCI)—an insurance firm that priced workers' compensation nationwide, similar to the DBA insurance implicated in this case—in a role that regularly involved workers' compensation insurance issues and daily interaction with insurance agents. (*See generally* Docs. 66-2, Doc. 78-3.) Additionally, the Court finds that Mr. Hager is qualified by both education and experience and that Defendants' challenge to his qualifications go to the weight, and not the admissibility, of his testimony. In that regard, Defendants will have ample opportunity to challenge Mr. Hager's qualifications on cross-examination.

Nonetheless, the Court finds that Mr. Hager's membership on the Florida Legislature is not particularly relevant to the issues at hand and may be unduly prejudicial. Thus, at trial, AMK9 will be precluded from introducing testimony as to Mr. Hager's regulatory or legislative experience in either Iowa or Florida. Indeed, in Mr. Hager's affidavit, he implies that it is his industry experience, and not his legislative or regulatory experience, that is most relevant to the issues in this action. (*See* Doc. 78-3, ¶ 16.)

As Mr. Hager testified at his deposition, his opinions are "based on what a reasonably prudent insurance agent should and would do in comparable circumstances." (Doc. 78-2, p. 5.) There is no question that the practice of prudent insurance agents is

specialized knowledge unknown to the average lay person. Thus, expert testimony is required in this action; indeed, the issues present a classic battle of the experts. Both Mr. Hager and Defendants' expert, Mr. William Austin, are consultants who testify regarding insurance, yet neither actually has experience placing coverage or selling policies. The Court anticipates that the absence of any "hands on" experience will be thoroughly explored in cross-examination, as it was during Mr. Hager's deposition. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky, but admissible evidence.").

## B.   Reliability Requirement

Defendants also contend that Mr. Hager's opinions do not meet the Reliability Requirement under *Daubert* on the grounds that Mr. Hager: (1) discounts the relevancy of Ms. Bermudez's failure to provide Ms. Payne with the Canadian Contract as requested; (2) rejects testimony that AMK9 bore the responsibility for failing to obtain DBA coverage prior to the Injuries; (3) lacks knowledge regarding the distinction between program DBA and non-program DBA and (4) will mislead the jury regarding the roles of a broker and an underwriter by opining that Rutherford did not timely bind coverage for AMK9's eventual DBA policy on the Canadian Contract. (Doc. 65, pp. 13–14.)

In a recent order denying a *Daubert* motion to exclude Mr. Hager's testimony, U.S. District Judge Carlos E. Mendoza stated that, "[t]o the extent [the challenging party] argues that Mr. Hager's opinions are flawed or contrary to the record evidence, this is a matter best addressed at trial by contemporaneous objection or vigorous cross-examination." *Hill v. Allianz Life Ins. Co. of N. Am.* ("***Hill***"), 6:14-cv-950 (Doc. 113,

p. 5). As intimated in the Court's discussion regarding Mr. Hager's qualifications, the Court agrees with Judge Mendoza's assessment that cross-examination is the more appropriate avenue for challenging the reliability of Mr. Hager's opinions.

### C. Helpfulness Requirement

Finally, Defendants challenge Mr. Hager's helpfulness as an expert. As grounds for their challenge, Defendants argue that: (1) Mr. Hager's purported testimony that Rutherford had heightened obligations due to a special relationship with AMK9 is an impermissible legal opinion; and (2) in repeatedly arguing that Rutherford "breached" its alleged duties to AMK9, Mr. Hager's testimony improperly invades the exclusive province of the Court to "instruct the jury on the law." (Doc. 65, pp. 14–17.) The Court disagrees.

Pursuant to Federal Rule of Evidence 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue." Judge Mendoza relied on Rule 704 in denying a similar challenge to Mr. Hager's testimony in *Hill*. (*Hill*, Doc. 113, p. 6.) Upon consideration, the Court similarly declines to exclude Mr. Hager's testimony on this basis.

## THE SUMMARY JUDGMENT MOTIONS

### I.   Standards

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact, and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of*

*Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)).  As to issues for which the non-movant would bear the burden of proof at trial, the movant has two options: (1) the movant may simply point out an absence of evidence to support the nonmoving party's case; or (2) the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *U.S. v. Four Parcels of Real Property in Green and Tuscaloosa Cntys. In State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp.*, 477 U.S. at 325).

"The burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir. 1993)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248) (1986)).

The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle*, 468 F.3d at 759. However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

## II.   Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the ground that AMK9's claims are barred by a four-year statute of limitations ("**SOL Motion**"). (Doc. 55.)  Defendants have

the burden of proof in establishing an affirmative defense based on the SOL. *Smith v. Duff & Phelps, Inc.*, 5 F.3d 488, 492 n.9 (11th Cir. 1993). In support of their SOL Motion, Defendants contend that AMK9's cause of action accrued no later than August 31, 2010, when—despite its knowledge that it did not have applicable DBA insurance—AMK9 first sustained damages by committing to pay—and actually paying—for benefits to which its injured employees would have been entitled under a DBA policy. (*See* Doc. 55, p. 2.) Additionally, Defendants maintain that AMK9 incurred damages as early as May 25, 2010, when it began taking immediate steps to defend itself against possible claims from its injured employees. (*Id.* at 17–19.) For its part, AMK9 contends that its cause of action against Defendants did not accrue until its settlement with Mr. Cicero in the Cicero Lawsuit on September 13, 2013. (Doc. 69, pp. 8–13.)

As discussed at the Hearing, two decisions are controlling here—*Kelly v. Lodwick*, 82 So. 3d 855 (Fla. 4th DCA 2011) and *Medical Data Systems, Inc. v. Coastal Insurance Group, Inc.*, 139 So. 3d 394 (Fla. 4th DCA 2014). The Court will discuss each decision in turn.

## A.  *Kelly*

In *Kelly*, a private school's insurer informed the school and the school's insurance agents that it would not renew the school's casualty policy, which was set to lapse on March 1, 2004. 82 So. 3d at 856. The agents subsequently received a commitment from a second insurer, who was willing to issue the school a new policy effective March 1, 2004, if the agents provided written confirmation to the second insurer indicating that the school desired the new policy ("**Requested Confirmation**"). *Id.* Because the agents failed

to provide the second insurer with the Requested Confirmation, on March 1, 2004, at 12:01 a.m., the school was left uninsured. *Id.*

On the afternoon of March 1, 2004, a student ("**Student**") was injured at the school due to the alleged negligence of a school employee ("**Employee**"). *Id.* That same day, the school contacted its insurance agents and learned that it was uninsured. *Id.*

On April 20, 2005, Student and her mother ("***Kelly* Plaintiffs**") sued the school and the Employee for the student's injuries ("**Negligence Litigation**"). *Id.* On January 8, 2009, the parties to the Negligence Litigation reached a settlement, in which the school assigned its cause of action against its insurance agents to the *Kelly* Plaintiffs. *Id.* On February 9, 2009, the *Kelly* Plaintiffs filed a complaint against the school's insurance agents for negligence and breach of fiduciary duty, alleging that the agents failed to obtain the necessary casualty insurance coverage. *Id.* Arguing that the four-year SOL period commenced when the school discovered it lacked coverage on March 1, 2004, the agents moved for dismissal, which the trial court granted. *Id.* at 856–57.

On appeal, the District Court of Appeal of Florida for the Fourth District ("**Fourth DCA**") reversed the trial court's ruling and concluded that the SOL period commenced on April 20, 2005, when the school and Employee incurred damages by retaining counsel to defend themselves against the *Kelly* Plaintiffs' claim. *Id.* at 858. The Fourth DCA's ruling was based its findings that: (1) "[t]he mere possibility of damage at a later date is insufficient to commence the limitations period;" and (2) "if the school and the [E]mployee took no action to defend themselves against the [*Kelly* Plaintiffs'] possible claim, and if the [*Kelly* Plaintiffs] never sued them, then the school and the [E]mployee would not have suffered damages." *Id.* at 859. The Fourth DCA further noted that

> situations may occur in which the party lacking insurance takes immediate steps to defend itself against the underlying plaintiff's possible suit. For example, the party lacking insurance immediately may retain counsel or may undertake its own investigation by taking witness statements, photographs, and other actions to preserve evidence. In such situations, the agent may be able to argue that the party incurring such fees and costs has suffered "an injury, although slight" for which "the statute of limitations attache[d] at once."

*Id.*

### B.   *Medical Data*

In *Medical Data*, a national medical debt collector ("**MDS**") relied on Coast Insurance Group ("**Coastal**") and its insurance agent to obtain appropriate liability coverage for its needs. 139 So. 3d at 395. Due to Coastal's efforts, Illinois Union issued MDS a policy, which excluded liability coverage for debt collection activities ("**IU Policy**"). *Id.* Beginning in April 2006, several lawsuits were filed against MDS for violations of the Fair Debt Collection Practices Act ("**FDCPA Litigation**"); these suits were settled in June 2008. *Id.* In the interim, MDS retained counsel to defend itself in the FDCPA Litigation. (*Id.*)

In November 2009, MDS sued Coastal for negligent failure to procure appropriate insurance coverage. *Id.* MDS later amended its complaint to add American Professional Liability Underwriters, Inc. ("**APLU**") as a defendant, alleging that Coastal retained APLU as a broker to procure the IU policy. *Id.* APLU subsequently moved for summary judgment, arguing that the claims were barred by the four-year SOL. *Id.* The trial court granted APLU's motion ("**SJ Ruling**"). *Id.*

The Fourth DCA declined to apply *Kelly* to resolve an appeal of the SJ Ruling on the grounds that: (1) *Kelly* was decided in the context of a motion to dismiss, while *Medical*

*Data* was decided on summary judgment; and (2) there was no insurance policy in effect in *Kelly*, while in *Medical Data*, there was an insurance policy that did not provide the necessary coverage. *Id.* at 396. The Fourth DCA determined that *Medical Data* was more analogous to a case decided by the Supreme Court of Florida—*Blumberg v. USAA Casualty Insurance Co.*, 790 So. 2d 1061, 1065 (Fla. 2001). *Id.*

As summarized by the Fourth DCA, in *Blumberg*, a burglar stole sports cards from the plaintiff's home. *Id.* After the insurer denied coverage, the homeowner sued the insurer for breach of contract ("**Coverage Case**"). *Id.* The insurer prevailed in the Coverage Case because the trial court determined that the policy did not cover the loss of the cards. *Id.* The homeowner then sued the insurance agent for negligence in procuring insurance, and the *Blumberg* trial court granted summary judgment in favor of the agent based on its SOL defense. *Id.* In finding that the action against the agent did not accrue until the Coverage Case concluded, the Supreme Court of Florida explained that "a negligence/malpractice cause of action accrues when the client incurs damages at the conclusion of the related or underlying judicial proceedings or, if there are no related or underlying judicial proceedings, when the client's right to sue in the related or underlying proceeding expires." *Blumberg*, 790 So. 2d at 1065. Applying *Blumberg* to the facts of *Medical Data*, the Fourth DCA concluded that MDS's cause of action against APLU did not accrue until June 2008, when the FDCPA Litigation settled. *Med. Data*, 139 So. 3d. at 396–97.

### C.    Application to the Instant Action

As stated in their SOL Motion, Defendants maintain that *Kelly* controls the SOL analysis in the instant action. (Doc. 55, pp. 17–19.) Additionally, Defendants contend that

*Medical Data* was wrongly decided and is an incorrect application of the Florida Supreme Court's decision in *Blumberg*. (See Doc. 93, pp. 34–38.) AMK9 counters that *Medical Data* controls and, therefore, its cause of action did not accrue until the resolution of the Cicero Lawsuit in 2013. (Doc. 69, pp. 8–13.)

Upon consideration, the Court agrees with AMK9. First, as the Fourth DCA highlighted in *Medical Data*, the key distinction between *Kelly* and *Medical Data* was the complete lack of insurance coverage in *Kelly* verses the existent, yet inadequate, coverage in *Medical Data*. *See Med. Data*, 139 So. 3d. at 396. That key distinction exists here because, unlike the facts presented in *Kelly*, the PA Policy did provide insurance coverage to AMK9—albeit inadequate—at the time of the Injuries. Thus, *Kelly* is distinguishable, and the Court finds that the facts at issue here are analogous with those of *Medical Data*, where MDS was covered by a policy that excluded coverage for the FDCPA Litigation initiated against it.

Importantly, as the defendant in the Cicero Lawsuit, AMK9 contended that the PA Policy was comparable to DBA insurance.[8] (Doc. 67, p. 12.) As the Plaintiffs in this action, AMK9 takes the opposite position—contending that the PA Policy is not sufficiently comparable to DBA insurance. Given these conflicting positions, AMK9 argues that the *Medical Data* rule is consistent with the policy applied in malpractice suits, which obviates the need for insureds to file successive suits to recover additional damages and avoid a SOL defense and allows parties to take inconsistent positions in successive suits. (*Id.* at 12–13.) The Court agrees.

---

[8] Indeed, according to former AMK9 employee, William J. Reid, Culver informed him that the PA Policy was comparable to DBA insurance. (Doc. 67-4, ¶¶ 4–5.)

Had AMK9 succeeded in its defense in the Cicero Lawsuit, it would have been protected under the DBA, just as if, had MDS had debt collector coverage in *Medical Data*, it would have similarly been protected in the FDCPA Litigation. Consequently, based on *Medical Data*, the Court finds that AMK9's cause of action did not accrue until the Cicero Lawsuit was resolved in September of 2013 and, therefore, Defendants' SOL Motion is due to be denied.

**I.     Plaintiffs' Motion for Summary Judgment**

Having found that AMK9's claims are not barred by the SOL, the Court now turns to AMK9's motion for summary judgment (Doc. 67). In its Motion, AMK9 seeks summary judgment on all four counts of the SAC based on Ms. Payne's Representations to Ms. Bermudez. To prevail on its Motion, AMK9 must demonstrate that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law on all of the elements of its claims. Fed. R. Civ. P. 56 (a).

**A.     Count I & IV – AMK9's Negligence Claims**

In Counts I and IV, AMK9 asserts claims against Defendant for negligent failure to procure insurance and negligent misrepresentation. (Doc. 30, ¶¶ 27–39, 66–75.)

> Under Florida law, negligence is the failure to use reasonable care. Reasonable care is that degree of care which a reasonably careful person would use under like circumstances. Negligence may consist either in doing something that a reasonably careful person would not do under like circumstances, or in failing to do something that a reasonably careful person would do under like circumstances. Negligence is a legal cause of loss, injury or damage if it directly and in a natural and continuous sequence produces or contributes substantially to producing such loss, injury or damage, so that it can reasonably be said that, but for the negligence, the loss, injury or damage would not have occurred. In order to be regarded as a legal cause of loss, injury or damage, negligence need not be the only cause.

*Wolicki-Gables v. Arrow Int'l, Inc.*, 641 F. Supp. 2d 1270, 1288 (M.D. Fla. 2009) (quoting Florida Standard Jury Instructions for Civil Cases [Reorganized]*,* Instruction 401.4), *aff'd*, 634 F.3d 1296 (11th Cir. 2011).

As to Count I, AMK9 contends that: (1) Defendants assumed a legal duty to procure appropriate insurance coverage to meet AMK9's needs with respect to the Canadian Contract; (2) Defendants breached their legal duty by conveying inaccurate information regarding the availability of DBA insurance for the Canadian Contract; and (3) Defendants' breach prevented AMK9 from obtaining proper coverage, thereby causing AMK9 significant damages that would otherwise have been avoided. (Doc. 67, p. 12.)

Defendants, however, argue that Ms. Bermudez's failure to provide Ms. Payne with the Canadian Contract or complete an insurance application ("**Inaction**") precludes the Court from granting summary judgment in favor of AMK9 on Count I. Particularly, Defendants contend that they cannot be found negligent for failing to procure coverage that they were never instructed to seek or never committed to obtain. (Doc. 79, pp. 16–17.) For its part, AMK9 maintains that Ms. Bermudez's Inaction is irrelevant because she provided Ms. Payne with operative information regarding AMK9's insurance needs under the Canadian Contract—that AMK9 needed DBA coverage under a contract funded by a foreign government. (Doc. 67, p. 13.)

Upon consideration, the Court finds that the determination of whether Defendants acted reasonably under the circumstances cannot be resolved at the summary judgment stage. Indeed,

> [s]ummary judgment will not usually be as feasible in negligence cases, where the standard of the reasonable man must be applied to conflicting testimony, as it is in other kinds of litigation. Even when the facts underlying the issue of negligence are undisputed, the issue must still be submitted to the jury if reasonable men could reach different conclusions and inferences from those facts.

*Croley v. Matson Nav. Co.*, 434 F.2d 73, 75 (5th Cir. 1970).[9]

Defendants have produced an e-mail in which Ms. Bermudez stated that she was unsure as to why she did not provide the Canadian Contract to Ms. Payne as requested. (*See* Doc. 80-6 ("I cannot figure out why the Canada [Statement of Work] was not included").) Construing the facts in the light most favorable to Defendants—the non-moving party—Defendants have provided evidence from which a jury could infer that Ms. Bermudez's Inaction was an oversight. Consequently, a reasonable juror could conclude that Defendants acted reasonably under the circumstances or that Defendants were not the legal cause of AMK9's damages. On the other hand, a reasonable juror could also conclude that, even in spite of Ms. Bermudez's Inaction, Ms. Payne's Representations were unreasonable under the circumstances. In either event, summary judgment is inappropriate. *See City of Delray Beach, Fla.*, 85 F.3d 1527, 1530 (11th Cir. 1996) ("If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.").

For the same reasons, the Court finds that summary judgment is also due to be denied as to AMK9's claim for negligent misrepresentation. Indeed, to enter summary

---

[9] All decisions handed down by the U.S. Court of Appeals for the Fifth Circuit prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Pritchard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

judgment on the negligent misrepresentation claim, the Court must conclude that Defendants were negligent in making a false statement. *See* Florida Standard Jury Instructions—Civil Cases [Reorganized], Instruction 409.8 (instructing that for a claim for negligent misrepresentation, the jury must find, *inter alia*, that Defendants were negligent in making the statement). Based on the conflicting inferences that may be drawn from Ms. Bermudez's Inaction and Ms. Payne's Representations, the Court finds that summary judgment is not warranted, particularly in light of Defendants' representations as to the distinction between program and non-program DBA insurance. *See supra* note 4.

## B.    Count II – Breach of Fiduciary Duty

In Count II of the SAC, AMK9 asserts a claim against Defendants for breach of fiduciary duty. In support, AMK9 maintains that: (1) Defendants held themselves out as experts in the field of DBA insurance; (2) AMK9 began an on-going relationship with Defendants in May 2009, during which time Defendants served as AMK9's broker of record for DBA insurance on contracts funded by the USG ("**Record Broker Relationship**"); and (3) based on the Record Broker Relationship and previous experiences, AMK9 relied on Defendants for guidance in the procurement of DBA insurance for the Canadian Contract. (Doc. 67, pp. 14–15.)

Generally, a fiduciary has an "affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading his clients." *Sec. & Exch. Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963). However, the scope of a broker's fiduciary duty in advising an insured as to its insurance needs has not yet been determined under Florida law.

26

Construing the issue as one of first impression in Florida, U.S. District Judge Daniel

D.K. Hurley delved into this novel area in *Tiara Condominium Association, Inc. v. March,*

*USA, Inc.*, 991 F. Supp. 2d 1271 (S.D. Fla. 2014). Reviewing case law from various

jurisdictions, Judge Hurley concluded that "an insurance agent [generally] has no duty to

advise the insured as to the insured's insurance coverage needs" and that this rule is

equally applicable to insurance brokers. 991 F. Supp. 2d at 1280. A well-developed body

of case law throughout the country recognizes an exception to the general rule "when a

broker encourages and engages in a 'special relationship' with its client, thereby triggering

an enhanced duty of care to advise the client about the amount of coverage prudently

needed to meet its complete insurance needs." *Id.* at 1281. Examples from case law,

which support a finding of a "special relationship," include:

> (1) where the agent misrepresented the nature of the
> coverage being offered or provided, and the insured justifiably
> relied on that representation in selecting the policy; (2) where
> the agent voluntarily assumed the responsibility for selecting
> the appropriate insurance policy for the insured (by express
> agreement or promise to the insured); **(3) where the agent
> held itself out as having expertise in a given field of
> insurance being sought by insured, and the insured
> relied on that expertise;** (4) where the agent or broker
> exercised broad discretion to service the insured's needs, and
> received compensation above the customary premium paid
> for the expert advice provided; and (5) where the agent was
> intimately involved in the insured's business affairs, or
> regularly gave the insured advice or assistance in maintaining
> proper coverage.

*Id.* (emphasis added). Moreover, relevant factors for the factfinder's consideration in

determining whether a broker shared a "special relationship" with its client, include:

> (1) representations by the broker about its expertise;
> (2) representations by the broker about the breadth of the
> coverage obtained; (3) the length and depth of the

> relationship; (4) the extent of the broker's involvement in the client's decision-making about its insurance needs; (5) information volunteered by the broker about the client's insurance needs; and (6) payment of additional compensation for advisory services ("**Considerations**").

*Id.* As such, "[w]hether an insurance broker shared a 'special relationship' with its client is a question of fact for the jury," particularly where the record contains disputed facts regarding these Considerations. *Id.* at 1281–82.

Defendants contend that AMK9 did not plead that the parties had a special relationship in either its SAC or its Motion. (Doc. 79, p. 17.) However, a review of the SAC reveals that while AMK9 did not use the words "special relationship," it specifically pled that Defendants held themselves out as experts in the field of DBA insurance and that AMK9 relied on that expertise. (Doc. 30, ¶¶ 7, 12, 42.) As such, the Court finds that AMK9 sufficiently pled the existence of the third type of special relationship outlined in *Tiara*. *See Tiara*, 991 F. Supp. 2d at 1281. In support, AMK9 submitted affidavit testimony that from May 21, 2008, to April 2011 Defendants were its exclusive brokers for DBA insurance. (*E.g.*, Doc. 67-2, ¶ 5.) AMK9's expert, Mr. Hager, also opines that a special relationship existed between AMK9 and Defendants. (Doc. 66-2 at 11–12.) Defendants' own admissions also support this conclusion. First, in its Answer, Defendants admit that "Ms. Payne had experience placing DBA insurance for her clients." (Doc. 45, ¶ 12.) Additionally, during her deposition, Ms. Payne admitted that she was more knowledgeable about DBA insurance than Ms. Bermudez. (Doc. 67-5, pp. 39–40.)

Defendants, however, contend that: (1) Mr. Hager's opinion as to the existence of a special relationship should be excluded on the basis of their *Daubert* motion; (2) the existence of a special relationship is question for the jury; and (3) the facts do not

otherwise support the finding of a special relationship based on exclusivity in light of AMK9's procurement of the PA Policy through another broker. (Doc. 79, pp. 16–17.)  At the Hearing, Defendants also argued that the facts regarding the existence of a special relationship were in dispute—specifically, that the Record Broker Relationship between AMK9 and Defendants ended on December 1, 2009, upon the expiration of the Compass DBA Policy. (*See* Doc. 93, p. 51–52.)

While the existence of a special relationship is a factual determination, as intimated at the Hearing, summary judgment may be appropriate where there are no material facts in dispute. (*See id.* pp. 50–51.) A key factor listed in the Considerations is the length and depth of the parties' relationship. *Tiara*, 991 F. Supp. 2d at 1281. Construing the facts in the light most favorable to Defendants, the Court finds that there is conflicting evidence as to the length of depth of the parties' client relationship from which a reasonable juror could conclude that the parties' relationship was confined solely to matters relating to the Compass DBA Policy. (*Compare* Doc. 80-12, p. 3 (authorizing Rutherford as AMK9's "exclusive insurance representative with respect to obtaining the DBA renewal proposal and servicing the current DBA policy in force") *and supra* note 2 (noting that the Compass DBA Policy expired on December 1, 2009), *with* Doc. 67-2, ¶ 5 (providing affidavit testimony that from May 21, 2008, to April 2011, Defendants were AMK9's exclusive brokers with respect DBA insurance). In light of this factual dispute as to the length and scope of the parties' relationship, the Court declines to grant summary judgment as to Count II. *See Tiara*, 991 F. Supp. 2d at 1282 ("Where the record contains disputed facts, the resolution of which could provide competent substantial evidence to support a finding of a 'special relationship' between a broker and its client, summary judgment is improper;

the matter must be resolved by a jury.").

### C.    Count III – Breach of Contract

Finally, in Count III, AMK9 alleges that Defendants breached an oral contract, under which Defendants agreed to procure DBA insurance for the Canadian Contract on AMK9's behalf. (Doc. 30, ¶¶ 53–65.)[10] Defendants counter that they never committed to obtain DBA coverage for AMK9. (Doc. 79, p. 19.) Defendants also reiterate that AMK9 never provided them with the necessary information to determine whether DBA coverage was available for the Canadian Contract. (*Id.*)

To prove the existence of a contract under Florida law, a party must establish the following elements: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms. *See Kolodziej v. Mason*, 774 F.3d 736, 740 (11th Cir. 2014). Moreover, a claim for breach of an oral contract arises only when the parties "mutually assented to a certain and definite proposition and left no essential terms open." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 607 F.3d 742, 746 (11th Cir. 2010) (quoting *Rubenstein v. Primedica Healthcare, Inc.,* 755 So.2d 746, 748 (Fla. 4th DCA 2000)).

As the Court suggested at the Hearing, AMK9 has not produced any evidence of an offer, acceptance, or mutual assent on the part of Defendants to procure DBA insurance for the Canadian Contract. (*See* Doc. 93, pp. 44–45.) Indeed, the e-mail communications submitted to the Court demonstrate the following. First, Ms. Bermudez

---

[10] Alternatively, AMK9 argues that if the Court makes a finding that there was no oral contract, then it should be permitted to seek remedies under equitable estoppel. (Doc. 67, pp. 18–19.) Because Plaintiffs did not plead equitable estoppel in the SAC, they are precluded from asserting it on summary judgment. (*See* Doc. 79, pp. 19, n.106.)

informed Defendants that AMK9 needed coverage for "a few more contracts" that were not Department of Defense contracts and inquired about coverage options. (Doc. 80-17, p. 3.) In response, Ms. Payne asked Ms. Bermudez about the source of funding and the performance location for the contracts. (*Id.*) Ms. Bermudez replied, "[t]hey are Canadian Contracts and the work is in Afghanistan." (*Id.* at 2.) Ms. Payne then advised Ms. Bermudez that the only available option was the PA Policy from Lloyd's of London and asked Ms. Payne for a copy for the Canadian Contract for review by Rutherford's DBA defense attorney "to be sure DBA doesn't apply". (*Id.*) Absent from this exchange is any evidence of an offer, acceptance, or mutual assent to procure DBA insurance for the Canadian Contract. Indeed, Ms. Payne essentially advised Ms. Bermudez that she would be unable to procure DBA insurance for the Canadian Contract. (*See* Doc. 80-17, pp. 2–3.) In light of the foregoing, the Court finds that AMK9 has fallen well short of meeting its burden to establish that it is entitled to judgment as a matter of law on its claim from breach of contract. As such, AMK9's Motion as to Count III is due to be denied.

### CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.    Defendant's *Daubert* Motion to Preclude the Testimony of Plaintiffs' Purported Expert, William Hager, and Memorandum of Law in Support (Doc. 65) is **GRANTED IN PART AND DENIED IN PART**.

   a.    For purposes of trial, Plaintiffs' expert, William Hager, will not be permitted to testify regarding his regulatory or legislative experience.

   b.    In all other respects, the Motion is **DENIED**.

2.    Defendants' Motion for Summary Judgment Based on Statute of Limitations

and Memorandum in Support (Doc. 55) is **DENIED**.

3.    Plaintiffs' Motion for Summary Judgment and Incorporated Memorandum of

Law (Doc. 67) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on May 11, 2016.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record